STATE OF NORTH CAROLINA v. DAVID ERIC MITCHELL

No. 655PA02

(Filed 6 February 2004)

**Motor Vehicles— driving while impaired—driver's license checkpoint**

The Court of Appeals did not err in a driving while impaired case by concluding that a driver's license checkpoint was legal, because: (1) officers are not constitutionally mandated to conduct driver's license checkpoints pursuant to written guidelines, the officer received sufficient supervisory authority to conduct the checkpoint, and the officers stopped all oncoming traffic at the checkpoint; (2) the pertinent officer had reasonable articulable suspicion to stop defendant when defendant ignored the officer's order to stop and forced the officer to jump out of the road to avoid being struck by defendant's vehicle; and (3) the officer had reasonable articulable suspicion that defendant committed several crimes including assaulting a police officer, attempting to elude an officer who was in the lawful performance of his duties, and driving a vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others.

Justice BRADY dissenting.

Justices WAINWRIGHT and EDMUNDS join in the dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a decision of the Court of Appeals, 154 N.C. App. 186, 571 S.E.2d 640 (2002), reversing an order entered in open court and reduced to writing on 17 October 2001 by Judge Marcus L. Johnson in Superior Court, Gaston County. Heard in the Supreme Court 16 October 2003.

> *Attorney General Roy Cooper, by Isaac T. Avery, III, Special Deputy Attorney General, and Patricia A. Duffy, Assistant Attorney General, for the State.*

> *American Civil Liberties Union of North Carolina Legal Foundation, Inc., by Seth H. Jaffe, for the defendant.*

ORR, Justice.

On 6 February 2000, defendant David Eric Mitchell was arrested and charged with driving while impaired in violation of N.C.G.S. § 20-138.1. Defendant was found guilty of the offense in District Court, Gaston County. He appealed to Superior Court and, on 17 September 2001, filed a pre-trial motion to suppress on the ground that his stop and arrest following his failure to stop at a driver's license checkpoint violated the Fourth and Fourteenth Amendments of the United States Constitution. The Superior Court granted defendant's motion to suppress defendant's stop and arrest, finding that defendant "was stopped as a direct result of a roadblock or checking station;" that "the stopping of the Defendant's vehicle at the February 6, 2000, check point was a seizure;" and that the checkpoint "violates the United States and North Carolina Constitutions" because of the "unbridled and unrestrained discretion" granted to the officers in the field. The State appealed the trial court's grant of defendant's motion to the Court of Appeals.

On appeal, the Court of Appeals concluded that the trial court needed only to address the suppression motion in the context of the legality of defendant's stop and arrest. In support of its decision, the Court of Appeals stated that the checkpoint "was not an unreasonable detention and therefore was valid under the Fourth Amendment." *State v. Mitchell*, 154 N.C. App. 186, 189-90, 571 S.E.2d 640, 643 (2002). We agree with the Court of Appeals regarding the legality of the checkpoint; however, we conclude that defendant's stop and arrest was proper without resting our decision on the constitutionality of the checkpoint. Accordingly, we affirm the decision of the Court of Appeals as modified herein.

The State's evidence showed the following: On 6 February 2000, Boyce Falls, a police officer with the Belmont Police Department, decided to set up a random driver's license check on U.S. Highway 29/74 to check westbound traffic for valid licenses and registrations. Falls testified that he had "standing permission" from Belmont Police Captain William Jonas to conduct driver's license checkpoints. Falls spoke with his shift sergeant before conducting the checkpoint to ensure that the sergeant had enough manpower for the checkpoint. Pursuant to the Belmont Police Department's requirements, three police officers were present at the checkpoint. Also, pursuant to these requirements, the officers conducted the checkpoint in a safe area, wore their traffic vests, held flashlights, which they used to direct automobiles to stop, and stopped every vehicle in the westbound lanes of U.S. 29/74. While these requirements were not stated in written form, Captain Jonas testified about them at the suppression hearing.

On the night in question, at 4:15 a.m., defendant approached the checkpoint, which was evidenced by the continuous activation of the blue lights on the patrol cars. Falls testified that as defendant approached the checkpoint, he shined his flashlight on his left hand, directing defendant to stop. Defendant did not stop. Officer Falls stated that:

> The closer [defendant] got—and he got very, very close to me—within twenty-five yards of me—I shined the flashlight in his eyes and said stop, whoa; and then I put my flashlight back down on my hand; and when I realized that he was only speeding up, I jumped out of the road and went and got in my vehicle so I could pursue after him because I knew he wasn't going to stop at that time.

Next, Falls pursued defendant with the blue lights and siren of his patrol car activated. Defendant finally stopped one and one-half miles beyond the checkpoint. We have no evidence in the record of what transpired after defendant stopped; the only evidence before us comes from the suppression hearing, and relates to events that occurred prior to the stop.

The only issue raised by defendant and addressed by the trial court at the suppression hearing was whether the stop and arrest should be suppressed. The constitutionality of the checkpoint was the rationale for defendant's argument that the stop and arrest should be suppressed because the checkpoint was unconstitutionally autho-

rized. While concluding that the checkpoint was constitutional, we also conclude that the trial court erred by analyzing defendant's stop and arrest in terms of the legality of the checkpoint. Defendant failed to stop at the checkpoint and in fact, according to Officer Falls' testimony, increased his speed and forced Falls to quickly move out of the path of the oncoming vehicle. Therefore, whether defendant's stop and arrest should be suppressed turns on whether Officer Falls had reasonable articulable suspicion to stop defendant after defendant drove through the checkpoint and nearly struck Falls with the vehicle. We conclude that Officer Falls did have reasonable articulable suspicion to stop defendant. Therefore, the trial court erred by suppressing defendant's stop and arrest.

Police officers effectuate a seizure when they stop a vehicle at a checkpoint. *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 148 L. Ed. 2d 333, 342 (2000). But, "[t]he Fourth Amendment does not treat a motorist's car as his castle." *Illinois v. Lidster*, —— U.S. ——, ——, —— L. Ed. 2d ——, —— (Jan. 13, 2004) (No. 02-1060). And checkpoint stops conform to the Fourth Amendment if they are reasonable. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 L. Ed. 2d 412, 420 (1990). "[W]e must judge [the] reasonableness [of a checkpoint stop], hence, its constitutionality, on the basis of individual circumstances." *Lidster* at ——, —— L. Ed. 2d at ——. In the case at bar, we conclude that the checkpoint is reasonable, and thus conforms to the Fourth Amendment.

Because checkpoint stops are minimally intrusive, and are not subjective stops, like those arising from roving patrols, checkpoints are viewed with less scrutiny than are roving patrols. As the U.S. Supreme Court stated in *United States v. Ortiz*, 422 U.S. 891, 894-95, 45 L. Ed. 2d 623, 628 (1975):

> [T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

In the instant case, the checkpoint stop was only a minimal intrusion.

Relying on *Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, where the United States Supreme Court upheld a sobriety checkpoint conducted pursuant to written guidelines, defendant argues and the dissent agrees

STATE v. MITCHELL

[358 N.C. 63 (2004)]

that the Fourth Amendment prohibits officers from conducting checkpoints without written guidelines. We disagree. Although the Michigan State Police in *Sitz* conducted the sobriety checkpoint pursuant to written guidelines, the United States Supreme Court did not uphold the checkpoint solely because of those written guidelines. *Id.* at 453, 110 L. Ed. 2d at 422. The Court also found the checkpoint constitutional because it was a checkpoint, not a roving patrol, and because the police stopped every approaching vehicle. Similarly, in the instant case, the Belmont Police stopped every oncoming vehicle.

Defendant also claims *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660 (1979), prohibits police officers from conducting driver's license checkpoints without written guidelines. In *Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, the United States Supreme Court held that the Fourth Amendment prohibits police from randomly stopping motorists to check their driver's licenses and registrations. *Id.* at 663, 59 L. Ed. 2d at 673. The Court condemned the "unbridled discretion" exercised by law enforcement officers conducting these spot checks. *Id.* at 661, 59 L. Ed. 2d at 672. However, as defendant concedes, the Court in *Prouse* sanctioned checkpoints like the one at issue, stating: "Questioning of all oncoming traffic at roadblock-type stops is one possible alternative [to random stops]." *Id.* at 663, 59 L. Ed. 2d at 674. As previously noted, the officers stopped all oncoming traffic at the checkpoint.

Neither *Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, *Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, nor the Fourth Amendment requires police departments to have written guidelines before conducting driver's license checkpoints, nor do we find any such requirement under our state constitution. Therefore, we decline to conclude that checkpoints conducted without written guidelines are per se unconstitutional. Here adequate internal guidelines were testified to and implemented.

Defendant also contends the checkpoint is unconstitutional because Officer Falls, who established the checkpoint, failed to obtain supervisory permission before creating it. To support this contention, defendant relies heavily on *Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, in which the United States Supreme Court held that a police officer abused his discretion by randomly stopping a driver to check the driver's license and registration. Defendant contends that to prevent police officers from abusing their discretion, this Court should require them to obtain supervisory permission before creating driver's license checkpoints. But, in the case *sub judice*, Officer Falls

had supervisory permission to create the checkpoint. Officer Falls testified that before conducting the checkpoint, he "spoke with the shift sergeant . . . [t]o make sure [the sergeant] ha[d] the manpower" for Falls to set up the checkpoint. Additionally, Falls testified that he had "standing permission" from Captain Jonas to conduct driver's license checkpoints as long as he followed Jonas' guidelines. Captain Jonas' guidelines, as testified to at the hearing, included: requiring his police officers to conduct driver's license checkpoints in safe places that had proper lighting; requiring officers to activate their blue lights while conducting a checkpoint; requiring officers to stop all cars approaching a checkpoint; and requiring at least three officers to be present at a checkpoint.

We conclude that Falls' standing permission to set up check-points pursuant to Captain Jonas' oral guidelines and Officer Falls' call to his supervisor before creating the checkpoint at issue are constitutionally sufficient restraints to keep Falls from abusing his discretion. Because police officers are not constitutionally mandated to conduct driver's license checkpoints pursuant to written guide-lines; because Officer Falls received sufficient supervisory authority to conduct the checkpoint; and because the officers stopped all oncoming traffic at the checkpoint, we conclude that the checkpoint was constitutional.

Finally, we note that in the United States Supreme Court's most recent decision on the constitutionality of checkpoints, the Court neither addressed the need for officers to set up checkpoints pursuant to written guidelines nor the need for officers to obtain supervisory permission before creating a checkpoint. *Lidster.* —— U.S. ——, —— L. Ed. 2d ——. That neither the parties in *Lidster*, nor the Supreme Court itself were compelled to address these issues indi-cates the issues are not lynchpins for determining the constitutional-ity of a checkpoint.

*Lidster* involved a roadblock set up to seek information about a prior crime, and not a roadblock set up to check drivers' licenses and registrations. But here, defendant's argument requesting this Court to impose additional constraints on police officers who set up driver's license checkpoints would arguably apply to police officers who set up information-seeking checkpoints. Thus, we conclude that the absence in *Lidster* of any focus on an issue dealing with supervisory permission and written guidelines indicates that these issues do not merit a constitutionally mandated reversal in a roadblock case such as the one *sub judice.*

Alternatively, because defendant did not stop at the checkpoint, we also consider whether Officer Falls had reasonable articulable suspicion to stop defendant after defendant ignored the officer's order to stop and forced Falls to jump out of the road to avoid being struck by defendant's vehicle. A police officer may stop a person if the officer has "reasonable articulable suspicion" that the person was engaged in criminal activity prior to the seizure. *State v. Foreman*, 351 N.C. 627, 631, 527 S.E.2d 921, 923 (2000). "When an officer observes conduct which leads him reasonably to believe that criminal conduct may be afoot, he may stop the suspicious person to make reasonable inquiries." *State v. Pearson*, 348 N.C. 272, 275, 498 S.E.2d 599, 600 (1998).

Officer Falls had reasonable articulable suspicion to stop defendant. As the United States Supreme Court recently stated: "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576 (2000) (holding that a police officer had reasonable articulable suspicion to stop a defendant where defendant, without provocation, fled upon seeing police officers). In the case *sub judice*, defendant accelerated his vehicle when Falls ordered him to stop, and defendant's vehicle nearly struck Falls. Defendant's actions constituted evidence of flight. This flight and the surrounding circumstances gave Officer Falls reasonable articulable suspicion to stop defendant. We note, however, that the facts of the case do not deal with the circumstance where a driver makes a legal turn away from a checkpoint.

Furthermore, without concluding that defendant committed any crimes, we note that Falls had reasonable articulable suspicion that defendant committed several crimes: assaulting a police officer, "attempting to elude a law enforcement officer who is in the lawful performance of his duties" in violation of N.C.G.S. § 20-141.5(a) (2001), and driving a vehicle "carelessly and heedlessly in willful or wanton disregard of the rights or safety of others," in violation of the reckless driving statute, N.C.G.S. § 20-140(a) (2001).

Falls also had reasonable articulable suspicion that defendant committed an assault. "There is no statutory definition of assault in North Carolina, and the crime of assault is governed by common law rules." *State v. Roberts*, 270 N.C. 655, 658, 155 S.E.2d 303, 305 (1967). This Court defines assault as, " 'an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show

of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm.' " *Id.* (quoting 1 Strong's N.C. Index, Assault and Battery, § 4, p. 182 [1957]). Because defendant accelerated his vehicle as he directly approached Officer Falls, Falls could have determined that defendant was attempting to injure him. Hence, Falls had reasonable articulable suspicion that defendant committed an assault.

Moreover, the fact that defendant accelerated when Officer Falls requested him to stop, and that defendant nearly hit Falls, provided Falls with reasonable articulable suspicion that defendant violated N.C.G.S. § 20-141.5(a) (2001), which states: "It shall be unlawful for any person to operate a motor vehicle on a street, highway, or public vehicular area while fleeing or attempting to elude a law enforcement officer who is in the lawful performance of his duties," and N.C.G.S. § 20-140(a) (2001), which states: "Any person who drives any vehicle upon a highway or any public vehicular area carelessly and heedlessly in willful or wanton disregard of the rights or safety of others shall be guilty of reckless driving." Therefore, regardless of the constitutional status of the checkpoint, Officer Falls properly stopped and seized defendant. Accordingly, the trial court erred in suppressing evidence of defendant's stop and arrest.

To follow the dissent's argument to its logical and practical conclusion under the facts of this case would result in the inability of a law enforcement officer to stop a motorist who disobeyed the officer's request to stop at a roadblock. The dissent attempts to avoid this conclusion by stating that: "Police officers may certainly develop a reasonable articulable suspicion to stop a car based upon their observations, *unrelated to the checkpoint,* that a crime has been committed." Even with this acknowledgment, under the dissent, a motorist who "guesses" correctly that a checkpoint is not validly set up would appear to have *carte blanche* to ignore the checkpoint absent circumstances unrelated to the checkpoint.

MODIFIED AND AFFIRMED.

Justice BRADY dissenting.

I acknowledge that impaired drivers seriously endanger the lives of their fellow citizens across our state and nation. I further acknowledge that North Carolina's state and local law enforcement agencies work diligently to ensure the safety of our streets and highways. However, I cannot agree with the majority's conclusion that this case

"turns on whether Officer Falls had reasonable articulable suspicion to stop defendant" after defendant proceeded through the license checkpoint; nor can I agree that the driver's license checkpoint at issue passes constitutional muster under the United States and North Carolina Constitutions. In this case, field officers were endowed with unbridled discretion to implement and operate a random license checkpoint. I would adhere to the requirements of *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660 (1979) and hold that the discretion granted the Belmont officers rendered the checkpoint violative of the Fourth and Fourteenth Amendments of the United States Constitution, as well as Article I, Section 20 of the North Carolina Constitution. For these reasons, I respectfully dissent.

The paramount question in this case should be the constitutionality of the driver's license checkpoint. The majority acknowledges that this was the "only issue" raised by defendant and considered by the trial court at the suppression hearing. At that hearing, Officer Falls confirmed that defendant's "vehicle was pursued and stopped *solely* as a result of this random stop—this random checkpoint." (Emphasis added.) Thereafter, the trial court found that Officer Falls stopped defendant "as a sole and direct result of the random check point or roadblock." Instead of constraining itself to the trial court's factual findings, *see State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996) ("If supported by competent evidence, the trial court's findings of fact are conclusive on appeal."), the majority speculates as to what crimes would have justified Officer Falls' seizure of defendant, *see cf.* 2 Wayne R. LaFave, *Search and Seizure* § 3.2(d), at 44 (3rd ed. 1996) ("It is axiomatic that hindsight may not be employed in determining whether a prior arrest or search was made upon probable cause."). However, defendant was never charged with any of the crimes the majority now suggests that he committed, nor did Officer Falls testify that he formulated probable cause to believe defendant had committed any of those offenses.

Clearly, defendant's behavior was questionable in that defendant, with no knowledge of the checkpoint's unconstitutional nature, failed to stop when so directed. Motorists do not have *carte blanche* to ignore checkpoints that they suspect are invalid and to avoid responsibility if they guess correctly. Police officers may certainly develop reasonable articulable suspicion to stop a car based upon their observations, unrelated to the checkpoint, that a crime has been committed. Armed with such suspicion, the officers' seizure of the vehicle is proper regardless of the constitutionality of the checkpoint. *See State*

STATE v. MITCHELL

[358 N.C. 63 (2004)]

*v. Palmquist,* —— S.W.3d ——, ——, 2003 Tenn. Crim. App. LEXIS 891, at *5 (Oct. 13, 2003) (No. M2002-01047-CCA-R3-CD) (concluding that a vehicle seizure was constitutional where an officer, stationed at an unconstitutional roadblock, testified that he stopped the vehicle "*only* because Defendant was illegally operating his vehicle without its headlights on, and not because Defendant had intentionally avoided the roadblock"). However, in the instant case, there is no record evidence to support the crimes speculated to by the majority.

As the license checkpoint was the impetus for defendant's stop, the determinative issue is as follows: Did the degree of discretion afforded Belmont Police Officer Falls render the random license checkpoint unreasonable and therefore unconstitutional under the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 20 of the North Carolina Constitution? Upon a careful analysis of the relevant United States Supreme Court jurisprudence, I believe that it did.

The Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also* N.C. Const. art. I, § 20 ("General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted."); *State v. Grooms,* 353 N.C. 50, 73, 540 S.E.2d 713, 728 (2000) (noting the similarity between the Fourth Amendment to the federal constitution and the General Warrants Clause of the state constitution), *cert. denied,* 534 U.S. 838, 151 L. Ed. 2d 54 (2001). While license checks and sobriety checks are not *per se* unconstitutional, it is well established that stopping a person at such checkpoints is a seizure within the meaning of the Fourth Amendment and therefore must be reasonable. *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 L. Ed. 2d 412, 420 (1990); *Prouse,* 440 U.S. at 653-54, 59 L. Ed. 2d at 667. Because checkpoint stops are not based on individualized suspicion, they must be carried out in a manner that avoids the exercise of "unbridled discretion" by officers in the field. *Prouse,* 440 U.S. at 663, 59 L. Ed. 2d at 674 ("[P]ersons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.").

**STATE v. MITCHELL**

[358 N.C. 63 (2004)]

In *Prouse*, the United States Supreme Court specifically addressed the constitutionality of a practice by which a patrol officer in a police cruiser stopped vehicles and detained drivers to spot check their licenses and registrations without reasonable articulable suspicion to justify the stops. *Id.* at 650, 59 L. Ed. 2d at 665. At those stops, "[t]he patrolman was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks, promulgated by either his department or the State Attorney General." *Id.*

The Supreme Court held in *Prouse* that the suspicionless seizure of motorists for spot checks was unreasonable under the Fourth Amendment because the practice granted the patrol officer "unbridled discretion." *Id.* at 663, 59 L. Ed. 2d at 674. The Court articulated the " 'grave danger' " inherent in the abuse of officer discretion as follows:

> When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of *standardless and unconstrained discretion is the evil the Court has discerned* when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

440 U.S. at 661-62, 59 L. Ed. 2d at 672 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 559, 49 L. Ed. 2d 1116, 1129 (1976)) (emphasis added). The Court then clarified that "[t]his holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." *Id.* at 663, 59 L. Ed. 2d at 674. While *dicta* within *Prouse* indicated that stopping all vehicles might be one such method to eliminate the evil inherent in spot checking, *id.* at 663, 59 L. Ed. 2d at 674, United States Supreme Court jurisprudence strongly suggests that the method for conducting the type of suspicionless stop at issue in the present case would be chosen, planned, disseminated, and regulated from a supervisory level, *see, e.g., Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412; *Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116; *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333 (2000).

**STATE v. MITCHELL**

[358 N.C. 63 (2004)]

This concept was first voiced by the United States Supreme Court in *Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, in which the Court upheld the constitutionality of suspicionless seizures at fixed immigration checkpoints. In *Martinez-Fuerte*, the Court explained,

> [t]he location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class.

*Id.* at 559, 49 L. Ed. 2d at 1129.

Subsequently, in *Sitz*, the Court placed great emphasis on the fact that a roadblock for detecting impaired drivers was conducted under *written* "guidelines setting forth procedures governing checkpoint operations, site selection, and publicity" that left virtually no discretion to the officer in the field. 496 U.S. at 447, 110 L. Ed. 2d at 418 (upholding the constitutionality of a roadblock for detecting impaired drivers). Further, the United States Supreme Court recently stated that a law enforcement officer cannot undertake a suspicionless seizure when the seizure's primary purpose is "to advance 'the general interest in crime control.' " *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d. at 345 (quoting *Prouse*, 440 U.S. at 659, n.18, 59 L. Ed. 2d at 671, n.18) (explaining that the primary purpose of a seizure is to be ascertained at the *programmatic level*). Although *Edmond* does not address the specific issue raised by the present case, it illustrates the need for and the Court's expectation that law enforcement agencies implement standard written procedures to prevent abuses of officer discretion.

Most recently, in *Illinois v. Lidster*, the Supreme Court scrutinized a highway checkpoint set up to solicit information from motorists regarding a hit-and-run accident. *Illinois v. Lidster*, —— U.S. ——, ——, —— L. Ed. 2d ——, ——, 2004 LEXIS 656 (Jan. 13, 2004) (No. 02-1060). The Court, in *Lidster*, validated a new and wholly independent class of constitutional suspicionless searches, "information-seeking highway stops." *Id.* at ——, —— L. Ed. 2d at ——, 2004 LEXIS 656, at *6, *9. The Court emphasized that these checkpoints are not designed to help police apprehend the stopped drivers but are instead intended to "ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others." *Id.* at ——, —— L. Ed. 2d at ——, 2004 LEXIS 656,

at *9. Given the novel and limited nature of this particular Fourth Amendment distinction, *Lidster* has little precedential value with regard to the case currently before this Court.

Even so, it is instructive to note that, when determining the reasonableness of the *Lidster* seizure, the United States Supreme Court thoroughly discussed the narrow scope of the checkpoint stop. The Court reasoned that

> [t]he police *appropriately tailored* their checkpoint stops to fit important criminal investigatory needs. The stops took place about one week after the hit-and-run accident, on the same highway near the location of the accident, and at about the same time of night.

*Id.* at ——, —— L. Ed. 2d at ——, 2004 LEXIS 656, at *15 (emphasis added). During the checkpoint's implementation, "as each vehicle drew up to the checkpoint, an officer would stop it for 10 to 15 seconds, ask the occupants whether they had seen anything happen there the previous weekend, and hand each driver a flyer." *Id.* at ——, —— L. Ed. 2d at ——, 2004 LEXIS 656, at *6. Clearly, the impetus for the *Lidster* checkpoint, its date, the location, the time, and the questions asked were command directed by the Lombard Police Department, and not left to the discretion of a single officer in the field. The Court took care to weigh these factors in its determination that the checkpoint was reasonable under the Fourth Amendment.

I submit that the cases discussed *supra* mandate a significant level of supervisory authority and written standardized regulations regarding the time, place, and manner in which field officers conduct checkpoints. Standard policies and procedures are necessary for safeguarding the constitutional rights of individuals who are subjected to suspicionless seizures. Implementing written policies constitutes a manageable method for eliminating the "evil" of "standardless and unconstrained discretion." *Prouse*, 440 U.S. at 661, 59 L. Ed. 2d at 672. Indeed, the North Carolina State Highway Patrol already adheres to written guidelines that require supervision of every "preplanned, systematic stopping of vehicles to check motorists for compliance with motor vehicle laws including driving while impaired." Div. of State Highway Patrol, N.C. Dep't of Crime Control & Pub. Safety, *Policy and Procedures Manual* K.4 (2001) (mandating that "[a] daytime checking station must be approved by a district supervisor" and "[a] nighttime checking station must be approved by the First Sergeant or higher authority"). Furthermore, as

STATE v. MITCHELL

[358 N.C. 63 (2004)]

the State conceded upon questioning at oral argument, all law enforcement agencies and departments accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc. must follow similarly mandated procedures.

Notwithstanding the United States Supreme Court's admonitions against unconstrained field-officer discretion and the apparent prevailing law enforcement practice in North Carolina, no supervision or written regulations guided the field officers in the case *sub judice*. Officer Falls testified that the checkpoint at issue was considered by the Belmont Police Department to be a "random" license checkpoint. Testimony at the suppression hearing also confirmed that Officer Falls was granted "standing permission" to set up such a "random" license checkpoint whenever, wherever, however, and for as long as he deemed necessary.

The majority correctly points out that Officer Falls contacted his shift sergeant before implementing the checkpoint, but the record reveals that this contact was only to ensure that he had "the manpower . . . [to] actually set up the checkpoint." At the conclusion of the suppression hearing, the trial court recognized that Officer Falls had not obtained permission to establish the checkpoint. As the court was announcing its oral order, the State pointed out that "Officer Falls did get the permission from his shift sergeant." The trial court disagreed, noting that Officer Falls "said he *told* the shift sergeant he was going to do [a checkpoint]." (Emphasis added.)

As this case illustrates, a field officer's "standing permission" to conduct "random" license checkpoints absent standard guidelines as to when, where, and how to administer the roadblocks equates to a complete lack of supervisory authority, and in fact, represents the very form of unbridled discretion that was prohibited by the Supreme Court in *Prouse. See Heimlich v. State*, 231 Ga. App. 662, 663, 500 S.E.2d 388, 389 (1998) (concluding checkpoint constitutional where a field officer had a "standing order" to establish checkpoints), *overruled by Baker v. State*, 252 Ga. App. 695, 701-02, 556 S.E.2d 892, 899 (2001) (overruling *Heimlich* and similar cases based upon the court's obligation to "follow the United States Supreme Court's interpretation of Fourth Amendment requirements"), *cert. denied*, —— Ga. ——, —— S.E.2d ——, 2003 Ga. LEXIS 423 (May 13, 2003) (No. S02C0539). Furthermore, the guidelines referenced by the majority—choosing a safe location, wearing reflective vests, having three officers present, using flashlights, and turning on the patrol cars' blue lights—are not

guidelines specific to checkpoints but are standard nighttime safety procedures. Neither these procedures nor the practice of stopping every car curbs a field officer's discretion to set up a roadblock when and wherever he chooses. The suppression hearing testimony of Belmont Police Captain William Jonas is indicative. Captain Jonas confirmed that under the city's present practices, Belmont field officers "could set up a road check and check one car within five minutes and then dissolve the roadblock."

This Court's decision sanctioning total field-officer discretion is not only contrary to United States Supreme Court precedent, it also stands alone among the decisions of many of our sister jurisdictions that have addressed this or similar issues regarding checkpoints and roadblocks. *See, e.g., State v. Hicks*, 55 S.W.3d 515 (Tenn. 2001) (holding that there are two factors critical to a finding that officers' discretion was limited are whether the decision to set up the roadblock was made by the officers actually carrying it out and whether officers on the scene could decide for themselves the procedures to be used in operation of the checkpoint); *State v. Legg*, 536 S.E.2d 110 (W. Va. 2000) (concluding that conservation officers' stop of every car in a certain area to check for game, weapons, and hunting license was unconstitutional where the officers' only directive was to work the area); *LaFontaine v. State*, 269 Ga. 251, 497 S.E.2d 367 (concluding that the decision to implement the roadblock must be made by supervisory personnel not officers in the field), *cert. denied*, 525 U.S. 947, 142 L. Ed. 2d 307 (1998); *Commonwealth v. Bothman*, 941 S.W.2d 479 (Ky. Ct. App. 1996) (recognizing the importance of a systematic plan and supervisory control over establishment and operation of a checkpoint); *Campbell v. State*, 679 So. 2d 1168 (Fla. 1996) (per curiam) (holding that specific and detailed written guidelines are required before police can establish a constitutional roadblock); *Hagood v. Town of Town Creek*, 628 So. 2d 1057 (Ala. Crim. App. 1993) (concluding that roadblock unconstitutional where the operating officers had complete discretion to move it and did so); *Crandol v. City of Newport News*, 238 Va. 697, 386 S.E.2d 113 (1989) (acknowledging that key factors in determining the legality of a checkpoint include proof of advance decisions by superior officers as to the time and location of the roadblock, adequate training of officers, and on-site supervision of the officers conducting the roadblock). There is no indication that these states have suffered the phenomenon predicted by the majority, that is, the "endanger[ment] [of] the safety of the law enforcement officers and the public with

**STATE v. MITCHELL**

[358 N.C. 63 (2004)]

impunity." Rather, by providing clear direction to local law enforcement agencies as to the requirements of a constitutional checkpoint, these courts have enabled those agencies to better police the roads and highways of their communities, while safeguarding the constitutional rights of motorists.

Finally, under the majority's opinion, officers are given wide latitude in establishing license checkpoints but are greatly constrained by statutorily mandated standards in establishing similar impaired driver checkpoints, *see* N.C.G.S. § 20-16.3A (2003). Suppression hearing testimony in the present case suggests that this disparity between the standards for license checkpoints and impaired driver checkpoints can lead to abuse of field-officer discretion. According to Officer Falls' testimony, during the past two years, he had participated in only three impaired driver checkpoints but he had participated in *around forty* random license checkpoints.

Our founding fathers intended the Fourth Amendment to protect the right of ordinary individuals to be free from arbitrary invasions of their person and property by the state. Delegating *all* discretion to field officers for the purpose of implementing checkpoints necessarily invites unreasonable interference with that constitutional right. I believe that permitting field officers to choose the time, location, and manner of license checkpoints without supervision or written regulation implicitly validates unbridled field-officer discretion, an evil that the United States and North Carolina Constitutions strictly prohibit. Because Officer Falls was granted such unguided discretion to establish and conduct the license checkpoint at issue in the present case, defendant's seizure, resulting from that checkpoint, was unconstitutional. Accordingly, I would reverse the decision of the Court of Appeals.

Justices WAINWRIGHT and EDMUNDS join in this dissenting opinion.