STATE OF NORTH CAROLINA v. SHANNON DENISE HAISLIP

No. COA06-1488

(Filed 2 October 2007)

**Constitutional Law; Motor Vehicles— driving while impaired— standing to challenge constitutionality of checkpoint plan**

The trial court erred in a driving while impaired case by concluding that defendant did not have standing to challenge the constitutionality of a motor vehicle checkpoint plan, and the case is remanded for findings and conclusions on the checkpoint's constitutionality, because: (1) an officer seized defendant within the meaning of the Fourth Amendment when she stopped walking toward an apartment in response to the officer's presence and request, and a reasonable person at 2:30 a.m. would not feel free to leave upon being approached by a uniformed officer whose patrol car's blue lights were activated behind him; (2) the officer testified that he stopped defendant under the systematic checkpoint plan to conduct investigatory stops of anyone who turned to avoid the checkpoint, and not in light of and pursuant to the totality of the circumstances; and (3) the trial court's finding that defendant was not stopped by the checkpoint was not supported by the evidence.

Appeal by Defendant from judgment entered 23 May 2006 by Judge William C. Griffin, Jr., in Pitt County Superior Court. Heard in the Court of Appeals 6 June 2007.

*Attorney General Roy Cooper, by Special Deputy Attorney General Neil Dalton, for the State.*

*The Robinson Law Firm, P.A., by Leslie S. Robinson, for Defendant.*

STEPHENS, Judge.

On 3 February 2005, Defendant was issued a citation for driving while impaired in violation of N.C. Gen. Stat. § 20-138.1. After being found guilty of that offense in district court on 13 February 2006, Defendant appealed her conviction to the superior court pursuant to N.C. Gen. Stat. § 7A-271(b). On 28 February 2006, Defendant filed a motion to suppress the evidence used to convict her. At a hearing on the motion held outside the presence of the jury during trial on 22

STATE v. HAISLIP

[186 N.C. App. 275 (2007)]

May 2006, Defendant argued that the evidence used to convict her was procured as the result of an unconstitutional motor vehicle checkpoint. The trial court concluded that Defendant did not have standing to challenge the checkpoint's constitutionality because she was not "snared" by it. Defendant was subsequently found guilty by the jury. Defendant appeals.

The dispositive issue before this Court is whether Defendant has standing to challenge the constitutionality of the checkpoint plan. The trial court tailored its ruling so that "[this] Court can't duck this question[.]" We reverse the order and judgment of the trial court and remand for findings and conclusions on the checkpoint's constitutionality.

## FACTS

On the evening of 2 February 2005, a weeknight, patrol officers Lascallette ("Lascallette") and Webb ("Webb") of the Greenville Police Department "discussed the possibility" of setting up a "driver's license checkpoint" later that night. Although Lascallette testified that Webb received authority from Lieutenant Phipps ("Phipps"), their supervisor, to conduct a checkpoint, Phipps testified that he could not recall giving authorization for the checkpoint.

Lascallette and Webb decided to meet at a location on Firetower Road in Greenville around 2:30 a.m. because they "don't get many calls at that time[.]" Lascallette testified that the officers had conducted previous checkpoints at the Firetower Road location and that he "didn't think it was a very effective spot, but it served the purpose—it kept us gainfully employed." Although Lascallette labeled the checkpoint a "driver's license checkpoint," he acknowledged that the purpose of the checkpoint was to look for "[a]ny violation of [Chapter 20]" of North Carolina's General Statutes, which governs motor vehicle offenses in this state. Lascallette further testified that it was within the officers' discretion to determine the methodology by which the checkpoint was conducted at the scene. Though neither Lascallette nor Phipps could testify as to how, in fact, the Firetower Road checkpoint was conducted, both offered testimony as to how such checkpoints were usually conducted.

Lascallette and Webb met on Firetower Road that night as planned. They were joined by patrol officer Oxendine ("Oxendine"). Lascallette acknowledged that since all three officers were patrol officers, no particular person was "in charge" of the checkpoint. Where they met, Firetower is a three-lane road with an eastbound

lane, a westbound lane, and a center turn lane. Webb and Oxendine positioned their patrol cars back to back in the center turn lane, activated their patrol cars' blue lights and headlamps, and placed flares on the road in front of their cars. No signs were erected to indicate that a checkpoint was in progress. Lascallette estimated that a vehicle approaching from the east could see the patrol cars from three-quarters of a mile away. Lascallette decided to position his car as a "chase vehicle" that would conduct "investigatory stop[s]" of "anyone who turned around on [Webb and Oxendine][.]" Lascallette testified that the use of a chase vehicle was standard operating procedure. Accordingly, Lascallette parked his car facing north toward Firetower on Dudley's Grant Drive, a road intersecting Firetower four to five hundred yards to the east and with a clear view of the checkpoint's roadblock.

Within minutes of positioning himself on Dudley's Grant, Lascallette observed Defendant's car heading west on Firetower approaching the roadblock. As Defendant approached Dudley's Grant, she "slowed abruptly," and, without signaling, turned south onto Dudley's Grant from the westbound lane of traffic "crossing the turn lane." Lascallette "fell in behind" Defendant and activated his blue lights. Defendant parked in front of the second or third apartment building on the left side of Dudley's Grant, exited the vehicle, and walked toward one of the apartments. Lascallette parked his car with his blue lights flashing, approached Defendant, and said "excuse me." Defendant then stopped walking toward the apartment and turned toward Lascallette. Lascallette testified that Defendant's driving and her exit from the car were not "all [that] out of the ordinary[,]" and that he had stopped her because "she was avoiding a checkpoint." Noticing that Defendant was wearing pajamas and smelled of alcohol, Lascallette asked Defendant if she had been drinking. Defendant admitted that she had been drinking, and Lascallette asked her to participate in field sobriety tests.

Defendant immediately requested a pre-arrest test. In response, Lascallette told Defendant he "wasn't sure [he] even wanted to pursue charges" and "asked her if she wanted to take the field sobriety tests [so that he] could decide what [he] wanted to do with her[.]" Defendant then submitted to the field sobriety tests. After administering the tests, Lascallette explained the pre-arrest test procedures and asked Defendant if she still wanted a pre-arrest test. Defendant answered in the affirmative and was voluntarily transported by Lascallette to the Pitt County Detention Center. An Intoxilyzer 5000's

analysis of Defendant's breath revealed that Defendant had a blood alcohol concentration of twelve one-hundredths grams of alcohol per 210 liters of breath (.12). Thereafter, Lascallette issued Defendant a citation for driving while impaired.

## ANALYSIS

Defendant first argues that the trial court erred in concluding that she does not have standing to challenge the checkpoint's constitutionality. We agree.

"Our review of a denial of a motion to suppress by the trial court is 'limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.'" *State v. Barden*, 356 N.C. 316, 340, 572 S.E.2d 108, 125 (2002) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). According to the trial transcript, Judge Griffin made findings of fact and conclusions of law in a written order denying Defendant's motion to suppress. No such order appears in the record on appeal.[1] Thus, our review is limited to whether Judge Griffin's finding of fact, announced from the bench, that Defendant was not stopped by the checkpoint is supported by competent evidence and, if so, whether that finding supports his conclusion of law that Defendant does not have standing to challenge the checkpoint's constitutionality.

We first address the State's contention that Defendant was *"never* 'stopped.'" (Emphasis added.) The Fourth Amendment of the United States Constitution "prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 151 L. Ed. 2d 740, 749 (2002). Accordingly, in order to prevail on a motion to suppress, a defendant must first establish that she was "stopped" within the meaning of the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, *reh'g denied*, 448 U.S. 908, 65 L. Ed. 2d 1138 (1980). A stop does not occur "simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398 (1991). A stop occurs when, given the totality of the circumstances, a reasonable per-

---

1. Likewise, no such order appears in the trial court's file, according to the Pitt County Clerk of Superior Court's office.

son would not feel free to leave. *Mendenhall, supra; California v. Hodari D.*, 499 U.S. 621, 113 L. Ed. 2d 690 (1991); *State v. Campbell*, 359 N.C. 644, 617 S.E.2d 1 (2005), *cert. denied*, 547 U.S. 1073, 164 L. Ed. 2d 523 (2006).

In this case, Lascallette seized Defendant within the meaning of the Fourth Amendment. Lascallette "fell in behind" Defendant's vehicle and activated his blue lights as soon as she turned down Dudley's Grant. Defendant either ignored or did not see Lascallette's vehicle behind her, parked, and exited her car. As she was walking away, Lascallette approached her and got her attention. Lascallette's blue lights were still activated when Defendant turned toward him. A reasonable person, at 2:30 in the morning, would not feel free to leave upon being approached as Defendant was by a uniformed officer whose patrol car's blue lights were activated behind him. Defendant submitted to Lascallette's show of authority. We thus conclude that Defendant was seized within the meaning of the Fourth Amendment when she stopped walking toward the apartment in response to Lascallette's presence and request.

We next address Defendant's standing to challenge the constitutionality of the stop. In *State v. Foreman*, 351 N.C. 627, 527 S.E.2d 921 (2000), our Supreme Court reaffirmed the long-standing rule that " '[w]hen an officer observes conduct which leads him reasonably to believe that criminal conduct may be afoot, he may stop the suspicious person to make reasonable inquiries.' " *Id.* at 630, 527 S.E.2d at 923 (quoting *State v. Pearson*, 348 N.C. 272, 275, 498 S.E.2d 599, 600 (1998)). " '[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' " *State v. Thompson*, 296 N.C. 703, 706, 252 S.E.2d 776, 779 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906 (1968)), *cert. denied*, 444 U.S. 907, 62 L. Ed. 2d 143 (1979)). Where police officers conduct motor vehicle checkpoints,

> it is reasonable and permissible for an officer to monitor a checkpoint's entrance for vehicles whose drivers may be attempting to avoid the checkpoint, and it necessarily follows that an officer, in light of and pursuant to the totality of the circumstances or the checkpoint plan, may pursue and stop a vehicle which has turned away from a checkpoint within its perimeters for reasonable inquiry to determine why the vehicle turned away.

*Foreman*, 351 N.C. at 632-33, 527 S.E.2d at 924.

In this case, according to his undisputed testimony, Lascallette stopped Defendant "pursuant to . . . the checkpoint plan," not "in light of and pursuant to the totality of the circumstances[.]" *Id.* Lascallette testified that his job as the checkpoint's chase vehicle officer was to conduct "investigatory stop[s]" of *anyone* who turned around on [Officers Webb and Oxendine]" (emphasis added), and that he only stopped Defendant because "she was avoiding a checkpoint."[1] Lascallette pointed to no "specific and articulable facts" other than Defendant's turn down Dudley's Grant that warranted his stop. He did not stop her because she turned across the center turn lane, because of how she drove down Dudley's Grant, or because of the manner in which she exited her vehicle. He stopped her based on the systematic plan of the checkpoint. It necessarily follows, and we so hold, that when a defendant is stopped pursuant to a checkpoint plan, a defendant has standing to challenge the constitutionality of the plan by which she was "snared."

We disagree with the State's contention that our Supreme Court held in *State v. Mitchell*, 358 N.C. 63, 592 S.E.2d 543 (2004), "that it is error to analyze the stop and arrest of someone eluding a checkpoint in terms of the legality of the checkpoint." The defendant in *Mitchell* sped up as he approached a checkpoint's roadblock and drove through the roadblock, causing a police officer to jump out of the road to avoid being hit. The officer pursued and stopped the defendant a mile and a half down the road. The Supreme Court held *in the alternative* that (1) the defendant was stopped pursuant to a constitutional checkpoint, and (2) the officer had reasonable, articulable suspicion to stop the defendant. *Id.* Our holding in this case is consistent with the Supreme Court's analysis in *Mitchell*.

The trial court's finding that Defendant was not stopped by the checkpoint is not supported by the evidence. The trial court thus erred in ruling that Defendant did not have standing to challenge the constitutionality of the checkpoint plan. Accordingly, the order denying Defendant's motion to suppress is reversed. Because the trial court did not rule on the constitutionality of the checkpoint, the judgment entered upon the jury's verdict must be reversed. The case is remanded to the trial court for appropriate findings of fact and con-

---

2. We are not convinced that Defendant did, in fact, turn down Dudley's Grant to avoid the checkpoint. We note that Defendant made her left turn onto Dudley's Grant at least 400 yards before the checkpoint's roadblock. At that distance, and in the absence of posted signs indicating that a checkpoint was ahead, we question whether Defendant was avoiding the checkpoint.

clusions of law on the constitutionality of the checkpoint and for entry of an order or judgment consistent with such ruling.

REVERSED AND REMANDED.

Judges McGEE and SMITH concur.