# ILLINOIS *v.* LIDSTER

No. 02–1060.   Argued November 5, 2003—Decided January 13, 2004

420

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined, and in which STEVENS, SOUTER, and GINSBURG, JJ., joined as to Parts I and II. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which SOUTER and GINSBURG, JJ., joined, *post*, p. 428.

*Gary Feinerman,* Solicitor General of Illinois, argued the cause for petitioner. With him on the briefs were *Lisa Madigan,* Attorney General, and *Linda D. Woloshin, Lisa Anne Hoffman,* and *Karen Kaplan,* Assistant Attorneys General.

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Olson, Acting Assistant Attorney General Wray, Deputy Solicitor General Dreeben,* and *Patty Merkamp Stemler.*

*Donald John Ramsell* argued the cause and filed a brief for respondent.*

JUSTICE BREYER delivered the opinion of the Court.

This Fourth Amendment case focuses upon a highway checkpoint where police stopped motorists to ask them for information about a recent hit-and-run accident. We hold that the police stops were reasonable, hence, constitutional.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Jim Petro,* Attorney General of Ohio, *Douglas R. Cole,* State Solicitor, and *Robert C. Maier,* Assistant Solicitor, *Robert J. Spagnoletti,* Acting Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.,* of Alabama, *Terry Goddard* of Arizona, *M. Jane Brady* of Delaware, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Mike Hatch* of Minnesota, *Mike McGrath* of Montana, *Brian Sandoval* of Nevada, *Peter Heed* of New Hampshire, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Henry Dargan McMaster* of South Carolina, *Lawrence E. Long* of South Dakota, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Jerry W. Kilgore* of Virginia, and *Iver A. Stridiron* of the Virgin Islands; for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the Illinois Association of Chiefs of Police et al. by *James G. Sotos.*

Briefs of *amici curiae* urging affirmance were filed for the National Association of Criminal Defense Lawyers et al. by *Lawrence S. Lustberg, Joshua L. Dratel, Steven R. Shapiro,* and *Harvey Grossman;* and for the National College for DUI Defense by *Barry T. Simons* and *W. Troy McKinney.*

## I

The relevant background is as follows: On Saturday, August 23, 1997, just after midnight, an unknown motorist traveling eastbound on a highway in Lombard, Illinois, struck and killed a 70-year-old bicyclist. The motorist drove off without identifying himself. About one week later at about the same time of night and at about the same place, local police set up a highway checkpoint designed to obtain more information about the accident from the motoring public.

Police cars with flashing lights partially blocked the eastbound lanes of the highway. The blockage forced traffic to slow down, leading to lines of up to 15 cars in each lane. As each vehicle drew up to the checkpoint, an officer would stop it for 10 to 15 seconds, ask the occupants whether they had seen anything happen there the previous weekend, and hand each driver a flyer. The flyer said "ALERT . . . FATAL HIT & RUN ACCIDENT" and requested "ASSISTANCE IN IDENTIFYING THE VEHICLE AND DRIVER INVOLVED IN THIS ACCIDENT WHICH KILLED A 70 YEAR OLD BICYCLIST." App. 9.

Robert Lidster, the respondent, drove a minivan toward the checkpoint. As he approached the checkpoint, his van swerved, nearly hitting one of the officers. The officer smelled alcohol on Lidster's breath. He directed Lidster to a side street where another officer administered a sobriety test and then arrested Lidster. Lidster was tried and convicted in Illinois state court of driving under the influence of alcohol.

Lidster challenged the lawfulness of his arrest and conviction on the ground that the government had obtained much of the relevant evidence through use of a checkpoint stop that violated the Fourth Amendment. The trial court rejected that challenge. But an Illinois appellate court reached the opposite conclusion. 319 Ill. App. 3d 825, 747 N. E. 2d 419 (2001). The Illinois Supreme Court agreed

with the appellate court. It held (by a vote of 4 to 3) that our decision in *Indianapolis* v. *Edmond*, 531 U. S. 32 (2000), required it to find the stop unconstitutional. 202 Ill. 2d 1, 779 N. E. 2d 855 (2002).

Because lower courts have reached different conclusions about this matter, we granted certiorari. See *Burns* v. *Commonwealth*, 261 Va. 307, 541 S. E. 2d 872, cert. denied, 534 U. S. 1043 (2001) (finding similar checkpoint stop constitutional). We now reverse the Illinois Supreme Court's determination.

## II

The Illinois Supreme Court basically held that our decision in *Edmond* governs the outcome of this case. We do not agree. *Edmond* involved a checkpoint at which police stopped vehicles to look for evidence of drug crimes committed by occupants of those vehicles. After stopping a vehicle at the checkpoint, police would examine (from outside the vehicle) the vehicle's interior; they would walk a drug-sniffing dog around the exterior; and, if they found sufficient evidence of drug (or other) crimes, they would arrest the vehicle's occupants. 531 U. S., at 35. We found that police had set up this checkpoint primarily for general "crime control" purposes, *i. e.*, "to detect evidence of ordinary criminal wrongdoing." *Id.*, at 41. We noted that the stop was made without individualized suspicion. And we held that the Fourth Amendment forbids such a stop, in the absence of special circumstances. *Id.*, at 44.

The checkpoint stop here differs significantly from that in *Edmond*. The stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others. The police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals.

*Edmond*'s language, as well as its context, makes clear that the constitutionality of this latter, information-seeking kind of stop was not then before the Court. *Edmond* refers to the subject matter of its holding as "stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that *any given motorist has committed some crime.*" *Ibid.* (emphasis added). We concede that *Edmond* describes the law enforcement objective there in question as a "general interest in crime control," but it specifies that the phrase "general interest in crime control" does not refer to every "law enforcement" objective. *Id.*, at 44, n. 1. We must read this and related general language in *Edmond* as we often read general language in judicial opinions—as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.

Neither do we believe, *Edmond* aside, that the Fourth Amendment would have us apply an *Edmond*-type rule of automatic unconstitutionality to brief, information-seeking highway stops of the kind now before us. For one thing, the fact that such stops normally lack individualized suspicion cannot by itself determine the constitutional outcome. As in *Edmond*, the stop here at issue involves a motorist. The Fourth Amendment does not treat a motorist's car as his castle. See, *e. g., New York* v. *Class*, 475 U. S. 106, 112–113 (1986); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 561 (1976). And special law enforcement concerns will sometimes justify highway stops without individualized suspicion. See *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444 (1990) (sobriety checkpoint); *Martinez-Fuerte, supra* (Border Patrol checkpoint). Moreover, unlike *Edmond*, the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion has little role to play. Like certain other forms of police activity, say,

crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual.

For another thing, information-seeking highway stops are less likely to provoke anxiety or to prove intrusive. The stops are likely brief. The police are not likely to ask questions designed to elicit self-incriminating information. And citizens will often react positively when police simply ask for their help as "responsible citizen[s]" to "give whatever information they may have to aid in law enforcement." *Miranda* v. *Arizona*, 384 U. S. 436, 477–478 (1966).

Further, the law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida* v. *Royer*, 460 U. S. 491, 497 (1983). See also ALI, Model Code of Pre-Arraignment Procedure § 110.1(1) (1975) ("[L]aw enforcement officer may . . . request any person to furnish information or otherwise cooperate in the investigation or prevention of crime"). That, in part, is because voluntary requests play a vital role in police investigatory work. See, *e. g., Haynes* v. *Washington*, 373 U. S. 503, 515 (1963) ("[I]nterrogation of witnesses . . . is undoubtedly an essential tool in effective law enforcement"); U. S. Dept. of Justice, Eyewitness Evidence: A Guide for Law Enforcement 14–15 (Oct. 1999) (instructing law enforcement to gather information from witnesses near the scene).

The importance of soliciting the public's assistance is offset to some degree by the need to stop a motorist to obtain that help—a need less likely present where a pedestrian, not a motorist, is involved. The difference is significant in light of our determinations that such an involuntary stop amounts

to a "seizure" in Fourth Amendment terms. *E. g., Edmond,* 531 U. S., at 40. That difference, however, is not important enough to justify an *Edmond*-type rule here. After all, as we have said, the motorist stop will likely be brief. Any accompanying traffic delay should prove no more onerous than many that typically accompany normal traffic congestion. And the resulting voluntary questioning of a motorist is as likely to prove important for police investigation as is the questioning of a pedestrian. Given these considerations, it would seem anomalous were the law (1) ordinarily to allow police freely to seek the voluntary cooperation of pedestrians but (2) ordinarily to forbid police to seek similar voluntary cooperation from motorists.

Finally, we do not believe that an *Edmond*-type rule is needed to prevent an unreasonable proliferation of police checkpoints. Cf. 202 Ill. 2d, at 9–10, 779 N. E. 2d, at 859–860 (expressing that concern). Practical considerations— namely, limited police resources and community hostility to related traffic tieups—seem likely to inhibit any such proliferation. See Fell, Ferguson, Williams, & Fields, Why Aren't Sobriety Checkpoints Widely Adopted as an Enforcement Strategy in the United States? 35 Accident Analysis & Prevention 897 (Nov. 2003) (finding that sobriety checkpoints are not more widely used due to the lack of police resources and the lack of community support). And, of course, the Fourth Amendment's normal insistence that the stop be reasonable in context will still provide an important legal limitation on police use of this kind of information-seeking checkpoint.

These considerations, taken together, convince us that an *Edmond*-type presumptive rule of unconstitutionality does not apply here. That does not mean the stop is automatically, or even presumptively, constitutional. It simply means that we must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances. And as this Court said in *Brown* v. *Texas,* 443 U. S. 47, 51

(1979), in judging reasonableness, we look to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." See also *Sitz*, 496 U. S., at 450–455 (balancing these factors in determining reasonableness of a checkpoint stop); *Martinez-Fuerte*, 428 U. S., at 556–564 (same).

## III

We now consider the reasonableness of the checkpoint stop before us in light of the factors just mentioned, an issue that, in our view, has been fully argued here. See Brief for Petitioner 14–18; Brief for Respondent 17–27. We hold that the stop was constitutional.

The relevant public concern was grave. Police were investigating a crime that had resulted in a human death. No one denies the police's need to obtain more information at that time. And the stop's objective was to help find the perpetrator of a specific and known crime, not of unknown crimes of a general sort. Cf. *Edmond, supra,* at 44.

The stop advanced this grave public concern to a significant degree. The police appropriately tailored their checkpoint stops to fit important criminal investigatory needs. The stops took place about one week after the hit-and-run accident, on the same highway near the location of the accident, and at about the same time of night. And police used the stops to obtain information from drivers, some of whom might well have been in the vicinity of the crime at the time it occurred. See App. 28–29 (describing police belief that motorists routinely leaving work after night shifts at nearby industrial complexes might have seen something relevant).

Most importantly, the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect. Viewed objectively, each stop required only a brief wait in line—a very few minutes at most. Contact with the police lasted only a few seconds. Cf. *Martinez-Fuerte, supra,* at 547 (upholding stops of three-to-five minutes); *Sitz, supra,*

at 448 (upholding delays of 25 seconds). Police contact consisted simply of a request for information and the distribution of a flyer. Cf. *Martinez-Fuerte, supra,* at 546 (upholding inquiry as to motorists' citizenship and immigration status); *Sitz, supra,* at 447 (upholding examination of all drivers for signs of intoxication). Viewed subjectively, the contact provided little reason for anxiety or alarm. The police stopped all vehicles systematically. Cf. *Martinez-Fuerte, supra,* at 558; *Sitz, supra,* at 452–453. And there is no allegation here that the police acted in a discriminatory or otherwise unlawful manner while questioning motorists during stops.

For these reasons we conclude that the checkpoint stop was constitutional.

The judgment of the Illinois Supreme Court is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, concurring in part and dissenting in part.

There is a valid and important distinction between seizing a person to determine whether she has committed a crime and seizing a person to ask whether she has any information about an unknown person who committed a crime a week earlier. I therefore join Parts I and II of the Court's opinion explaining why our decision in *Indianapolis* v. *Edmond,* 531 U. S. 32 (2000), is not controlling in this case. However, I find the issue discussed in Part III of the opinion closer than the Court does and believe it would be wise to remand the case to the Illinois state courts to address that issue in the first instance.

In contrast to pedestrians, who are free to keep walking when they encounter police officers handing out flyers or seeking information, motorists who confront a roadblock are required to stop, and to remain stopped for as long as the officers choose to detain them. Such a seizure may seem

relatively innocuous to some, but annoying to others who are forced to wait for several minutes when the line of cars is lengthened—for example, by a surge of vehicles leaving a factory at the end of a shift. Still other drivers may find an unpublicized roadblock at midnight on a Saturday somewhat alarming.

On the other side of the equation, the likelihood that questioning a random sample of drivers will yield useful information about a hit-and-run accident that occurred a week earlier is speculative at best. To be sure, the sample in this case was not entirely random: The record reveals that the police knew that the victim had finished work at the Post Office shortly before the fatal accident, and hoped that other employees of the Post Office or the nearby industrial park might work on similar schedules and, thus, have been driving the same route at the same time the previous week. That is a plausible theory, but there is no evidence in the record that the police did anything to confirm that the nearby businesses in fact had shift changes at or near midnight on Saturdays, or that they had reason to believe that a roadblock would be more effective than, say, placing flyers on the employees' cars.

In short, the outcome of the multifactor test prescribed in *Brown* v. *Texas*, 443 U. S. 47 (1979), is by no means clear on *the facts of this case. Because the Illinois Appellate Court* and the State Supreme Court held that the Lombard roadblock was *per se* unconstitutional under *Indianapolis* v. *Edmond*, neither court attempted to apply the *Brown* test. "We ordinarily do not decide in the first instance issues not resolved below." *Pierce County* v. *Guillen*, 537 U. S. 129, 148, n. 10 (2003). We should be especially reluctant to abandon our role as a court of review in a case in which the constitutional inquiry requires analysis of local conditions and practices more familiar to judges closer to the scene. I would therefore remand the case to the Illinois

430

courts to undertake the initial analysis of the issue that the Court resolves in Part III of its opinion. To that extent, I respectfully dissent.