IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 17, 2004 Session

## STATE OF TENNESSEE v. JERRY W. HAYES

**Appeal from the Criminal Court for Hamilton County
No. 244043     Rebecca Stern, Judge**

---

**No. E2003-02338-CCA-R9-CD - Filed November 9, 2004**

---

The State appeals from an order of the Hamilton County Criminal Court suppressing evidence from a motorist stop on public housing authority property. Following the stop at the street entrance into the public housing development, the officer observed two quart containers of beer in the vehicle driven by Defendant, Jerry W. Hayes. A check of Hayes' driver's license revealed that the license had been suspended. Hayes was indicted for driving on a suspended license and being a minor in possession of alcohol. The stated purpose of the housing authority's checkpoint was to ensure the safety of its residents by excluding trespassers and others without legitimate purposes seeking entry into the housing development. The trial court found the stop constituted an unreasonable seizure and was thus unconstitutional. Pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, the State seeks review of this ruling. After review, we conclude that the stop was reasonable; therefore, no Fourth Amendment violation resulted. Accordingly, we reverse the trial court's suppression of the evidence and remand for further proceedings.

**Tenn. R. App. P. 9; Judgment of the Criminal Court Reversed and Remanded**

DAVID G. HAYES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; John H. Bledsoe, Assistant Attorney General; William H. Cox III, District Attorney General; and David Denny, Assistant District Attorney General, for the Appellant, State of Tennessee.

Ardena J. Garth, District Public Defender; Steven D. Brown (at trial) and Donna Robinson Miller (on appeal), Assistant District Public Defenders, Chattanooga, Tennessee, for the Appellee, Jerry W. Hayes.

# OPINION

## Factual Background

The Chattanooga Housing Authority (CHA), a governmental entity, operates Poss Homes, which provides housing for low-income families. On August 13, 2002, Officer Ralph Brown, an investigator with CHA, was conducting an identification checkpoint at the entrance to the Poss Homes development.[1] The checkpoint is located on Washington Street which is inside the public housing development. The City of Chattanooga had "ceded" this portion of Washington Street to CHA. At approximately 6:30 p.m., the Defendant approached the public housing area on 25th street and turned left into the Washington Street entrance. Twenty-fifth street ends at the Washington Street entrance.[2] Once on Washington Street, Officer Brown stopped the Defendant, who was alone in his vehicle. According to Brown, the following events then transpired:

> I told the [Defendant] what we were doing and he was asking questions about why are you stopping me. I said, basically, we are doing an ID check and we are checking to see if people live here. He showed me his driving license. I looked in the vehicle and there was beer in the front passenger's side of the vehicle and he looked under twenty-one years of age. I looked at his driving license. We ran his driving license through the computer and it came back suspended for nonpayment of fines.
>
> . . .
>
> . . . [T]he beer was still in the cans, it wasn't open. I made him pull over to the side of the road, ran him through the computer. I wrote him a citation.
>
> . . .
>
> . . . I told him to park his vehicle over there and call somebody. He says he was visiting some friends there, he wasn't specific about what friends he said. He said his uncle bought the beer and he told me that.

The Defendant was indicted for driving on a suspended license and being a minor in possession of alcohol. The Appellant moved to suppress the evidence, arguing that the vehicle checkpoint was unconstitutional.

At the suppression hearing, Officer Brown testified that the CHA conducted vehicle checkpoints at Poss Homes two or three times per week "usually late afternoon." He stopped every

---

[1] Both Chattanooga city police and CHA officers had jurisdiction in Poss Homes. However, all officers on the property worked under the authority of Officer Brown and in fulfillment of the CHA charter.

[2] Exhibit 6 depicts the entrance into the housing authority development at the intersection of East 25th Street and Washington Street.

vehicle which attempted to enter the development and, sometimes, pedestrians. Brown stated that drivers do not use Washington Street as a "thoroughfare" and, thus, the vehicle checkpoint did not affect drivers or pedestrians other than visitors to the development. However, the Washington Street entrance was not the only entrance into the development.

Brown's testimony established that it would "have been readily apparent to any motorist that they were entering into a federally subsidized housing area[.]" According to Brown, an individual approaching the development was free to leave the area and avoid the checkpoint, a situation which had occurred on one prior occasion. Nonetheless, no signs announced or explained the presence of the checkpoint.

Brown testified that, on the day in question, the Defendant was "like the third car we had stopped that day." According to Brown, the Defendant was free to leave until he noticed the beer inside the vehicle.

Officer Brown stated that the purpose of the checkpoint was "to make sure that people lived there that were coming in there and not people that were coming in there that were causing problems with selling drugs, drunkenness and various types of crimes. People were allowed to come in there to visit relatives[.]" Officer Brown testified that residents of Poss Homes pay a reduced rental rate. As a condition of being permitted to live in the development, residents are not allowed to "have individuals in there with alcohol or drugs or anyone causing problems[.]" Moreover, residents sign a contract that they will not permit individuals into the housing development who have been convicted of certain crimes. Brown also stated that special identification badges had been made for the residents of the development.[3]

He testified that the checkpoints were established by Jeff Hazelwood, the CHA police chief. He also testified as to the "Position Description" for his job, which was, "Under the general supervision of the Protective Services Manager, performs development and planning programs to conduct security programs. The assigned manager will promote projects, programs, and processes that enhance the safety and security of all Chattanooga Housing Authority residents, staff, and properties." The State admitted into evidence a memorandum from Hazelwood to all investigators. The memorandum provided, "When making your daily assignment rosters, please remember that we can only do ID checkpoints in developments where we own the streets. At this time that is only Poss Homes and College Hill Courts. You have no legal standing to do a check point on a public roadway." Brown asserted that the CHA had a neutral and explicit plan for executing these checkpoint stops. Regarding the established procedure for conducting the checkpoint, Brown testified:

---

[3]Contrary to the testimony of Officer Brown, the Defendant's grandmother and former member of the CHA Board, Erma Joyce, testified that, in August of 2002, the identification badges had not yet been issued to Poss Homes residents.

What I do, I'd wait till they got on the housing property. The first thing I do is what I call a greeting, "How are you doing. Good afternoon." Then after that I'd say, "I'm Ralph Brown, criminal investigator for Chattanooga Housing Authority." Then I would tell them the reason why I stopped them, I'm checking IDs, see if you live here in this residence - - I mean this housing development.

After that I'd ask for some form of identification, a driving license, and after that point sometimes I'd ask for registration and insurance, and after that I would make a final decision on what I was going to do.

The trial court found that the checkpoint violated the Fourth Amendment and suppressed the evidence, concluding that:

[a]ssuming *arguendo* that the exclusion of trespassers was a sufficiently compelling state interest to justify suspicionless seizures, there is no evidence of the degree to which the random entry checkpoint at Poss Homes, which . . . was at or near only one of more than one entrance to the development, advanced the interest. If the checkpoint was not efficacious, however, then the public interest in it did not outweigh even minimal interference with individual liberty.

Additionally, the trial court continued, "the checkpoint plan would violate Article I, § 7 for another reason, *viz*: the lack of limitations on the discretion of officers in the field." It is from this ruling that the State now appeals.

**ANALYSIS**

In reviewing a denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. *Id.; see also State v. Walton,* 41 S.W.3d 75, 81 (Tenn. 2001). Indeed, these findings will be upheld unless the evidence preponderates otherwise. *Daniel*, 12 S.W.3d at 423. Although deference is given to the trial court's findings of fact, this court conducts its own appraisal of the constitutional questions presented by reviewing the law and applying it to the specific facts of the particular case. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998) (citing *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

Both the state and federal constitutions protect individuals from unreasonable searches and seizures. U.S. CONST. amend. IV; TENN. CONST. art. I, § 7. Any police activity which involves a stop of an automobile qualifies as a seizure under both the state and federal constitutions. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); *State v. Westbrooks*, 594 S.W.2d 741, 743 (Tenn. 1979). The ultimate question is whether the stop was reasonable. In judging the

reasonableness of the stop, thus its constitutionality, we are required to examine: a) the gravity of the public concerns served by the seizure; b) the degree to which the seizure advances the public interest; and c) the severity of the interference with individual liberty. *State v. Downey*, 945 S.W.2d 102, 107 (Tenn. 1997) (quoting *Brown v. Texas*, 443 U.S. 47, 50-51, 99 S. Ct. 2637, 2640 (1979)).

In *State v. Hicks*, our supreme court addressed the constitutionality of drivers' license roadblocks under Article I, Section 7 of the Tennessee Constitution. *State v. Hicks*, 55 S.W.3d 515, 519 (Tenn. 2001). The court explained that the balancing test used in *Downey* is to be applied not just to sobriety checkpoints, but in "all cases involving constitutional challenges to roadblocks or checkpoints under the Tennessee Constitution." *Id.* at 524.

This case presents an issue of first impression in the State of Tennessee. Moreover, we would observe that the United States Supreme Court has not ruled directly upon area entry checkpoints, which is the subject of this appeal. We find the rationale of *Maxwell v. City of New York*, 102 F.3d 664 (2nd Cir. 1996), *cert. denied sub nom. Maxwell v. Bratton*, 552 U.S. 813 (1997), persuasive. In *Maxwell*, the Second Circuit upheld the operation of a checkpoint established for cars entering a high-crime area of the Bronx following a series of drive-by shootings. Like the court in *Maxwell*, we conclude that the checkpoint at issue here satisfies the three-prong test of *Brown*. *See also In re Hayden Jerome Jackson v. State*, No. 1021472 (Ala. Feb. 20, 2004).

First, the checkpoints in question served an important public concern. In *City of Indianapolis v. Edmond*, the Supreme Court concluded that a checkpoint is unlawful if its "primary purpose" cannot be distinguished from the "general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 48, 121 S. Ct. 447, 458 (2000). The conceded purpose of the Indianapolis roadblock was the interdiction of narcotics. In this case, the primary purpose of the checkpoint was that of ensuring the security of the residents in the housing development. Notwithstanding the decision in *Edmond*, the Court made clear:

> Our holding . . . does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute. Nor does our opinion speak to other intrusions aimed primarily at purposes beyond the general interest in crime control.

*Id*. at 47-48, 457. Moreover, in the recent decision of *Illinois v. Lister*, the United States Supreme Court held that a law enforcement checkpoint on a public highway for purposes of gathering information in a criminal investigation was not unconstitutional. *Illinois v. Lidster*, 540 U.S. 419, __, 124 S. Ct. 885, 891 (2004). "Like certain other forms of police activity, say crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual." *Id*. at __, 889.

The property in question is government-owned and dedicated for residential use by eligible low income families. The housing authority's mission is to provide safe housing for its residents. As part of its statutory mandate, CHA is required to provide its tenants with decent, safe, and

sanitary places to live. *See* Tenn. Code Ann. § 13-20-102 (1999). A condition of being permitted to live in the development requires residents to sign a contract that they will not have individuals convicted of certain crimes in the housing area.

Second, the purpose of these entry checkpoints is to provide a measure of security for those who live within the development. The identification checkpoint is an efficient means of determining that persons entering the housing development are residents or visitors with a legitimate business or social reason for being there. Thus, the checkpoints contributed "in a meaningful way to achieving the sufficiently compelling state interest." *Hicks*, 55 S.W.3d at 531.

Third, the intended level of intrusion to motorists or pedestrians is minimal. Regarding the severity of the interference with personal liberty and privacy, our supreme court has held "a roadblock cannot be deemed constitutionally reasonable unless 'it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene.'" *Id.* at 533 (quoting *Downey*, 945 S.W.2d at 104.) The decision in *Downey* enumerated several characteristics of a roadblock that minimize the risk of arbitrary intrusion under Article I, section 7, including: (1) stopping all cars traveling in both directions, unless congested traffic requires permitting motorists to pass through; (2) taking adequate safety precautions, such as warning approaching motorists of the roadblock and stopping cars only in a safe and visible area; (3) conducting the roadblock with uniformed officers and marked patrol cars with flashing emergency lights; and (4) providing advanced publicity of the roadblock to the public at large, separate from, and in addition to, any notice warnings given to approaching motorists. *Id.*

No vehicle was to be stopped or its operation questioned unless entry into the housing area was desired. If the motorist or pedestrian did not wish to pass through the checkpoint, then that person was free to turn around and leave. For those seeking entry, the stop was meant to be brief and was aimed solely at ascertaining the person's connection to the neighborhood. Officer Brown, a uniformed CHA officer, requested the Defendant "pull over to the side of the road" and "told him to park his vehicle" out of the way of oncoming traffic.

In *Downey*, our supreme court observed "that roadblocks furthered the state's interest not only by *detecting* drunk drivers but also by *deterring* such behavior, particularly when the road block is accompanied by advanced publicity." *Downey*, 945 S.W.2d at 109. Thus in large part, the public purpose for publicity in a sobriety roadblock is to deter criminal activity. As evidenced by the individual's choice not to pass through the checkpoint, the purpose of the subject identification checkpoint is unrelated to detecting or deterring criminal behavior. Accordingly, the efficacy of public notice would serve no purpose nor advance the public interest in protecting residents of the housing area.

In *United States v. Martinez-Fuerte*, the Supreme Court held that a checkpoint aimed at interdicting the flow of illegal aliens which involved "only a brief detention of travelers during which all that [was] required of the vehicle's occupants [was] a response to a brief question or two and

possibly the production of a document evidencing a right to be in the United States" was not sufficiently intrusive so as to violate the Fourth Amendment. *United States v. Martinez-Fuerte*, 428 U.S. 543, 558, 96 S. Ct. 3074, 3083 (1976) (quotation omitted). Here, as in *Martinez-Fuerte*, the request for evidence of a legitimate reason to enter the housing area was not significantly intrusive. Moreover, because the plan here was to stop all motorists seeking entry, there was little concern that the stop would generate "fear and surprise." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 452-53, 110 S. Ct. 2481, 2486 (1990); *Martinez-Fuerte*, 428 U.S. at 558, 96 S. Ct. at 3083 (where motorist can see that other vehicles are being stopped and can see visible signs of the officers' authority, there is less likelihood of fright or annoyance).

However, the most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of the officers in the field. *Hicks*, 55 S.W.3d at 533. Two facts are critical to finding that the officers' discretion on the scene was properly limited: (1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock. *Id.*

We emphasize the discretion afforded went only to the decision to permit or deny vehicular entry into the area, not to the detention of persons in the vehicles. *Maxwell*, 102 F.3d at 668. Officer Brown testified that the checkpoints were mandated by the CHA police chief. Police roadblocks need not be based on reasonable suspicion of particular drivers, *see Martinez-Fuerte*, 428 U.S. at 560-61, 96 S. Ct. at 3084, but the detention of particular motorists beyond the initial stop "may require satisfaction of an individualized suspicion standard." *Sitz*, 496 U.S. at 451, 110 S. Ct. at 2485; *see also Martinez-Fuerte*, 428 U.S. at 566-67, 96 S. Ct. at 3084 ("The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.") Thus, once the initial stop has been conducted, the decision to further detain a motorist must be based on particularized reasonable suspicion. *See generally Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

## CONCLUSION

Based upon the foregoing, we conclude that the checkpoint stop was reasonable under Fourth Amendment principles and thus constitutional. Accordingly, we reverse the order of the Hamilton County Criminal Court granting the Defendant's motion to suppress and remand for further proceedings consistent with this opinion.

_____
DAVID G. HAYES, JUDGE