LBROWN, C.J.
Robert Paul Garrison pled guilty to DWI Third Offense reserving his right to appeal the rejection of his motion to suppress evidence. State v. Crosby, 338 So.2d 584 (La.1976).[1]

Facts

At 11:00 p.m. on the evening of June 1, 2003, Kenneth Sasser, a University Police Officer at Louisiana Tech in Ruston, was on patrol on campus on Thornton Street in a marked university police cruiser. Thornton Street runs through the Louisiana Tech campus and continues south off campus for approximately one and a half blocks to West California Avenue. Approximately one block after Thornton Street leaves the boundary of the Tech campus, it intersects with Carey Avenue. Louisiana Tech has an off-site parking lot on Carey Avenue near its intersection with Thornton. West California Avenue is less than a half block from the intersection of Carey Avenue and Thornton Street.
Officer Sasser left the campus driving down Thornton to West California, where he turned around and headed back to the campus. It was then that he heard a disturbance coming from the Louisiana Tech parking lot on Carey Avenue. He described the sound as tires squealing.
As he passed Carey Avenue, Officer Sas-ser saw a tan pickup truck traveling on Carey approaching the intersection with Thornton Street. The truck’s right blinker was on, signaling a right turn onto Thornton in the direction of West California Avenue. Officer Sasser turned around and tried |2to get the driver’s attention. Officer Sasser did not know whether a crime had been committed. He felt that someone was just doing something stupid and that he needed to tell them to be careful. Officer Sasser felt that the driver may not have seen or heard him, since both of the trucks’ windows were rolled up. Officer Sasser activated his emergency lights, and the truck, with defendant driving and the only occupant, pulled into a parking lot.
Officer Sasser asked Garrison whether he was the one who had squealed his tires. Defendant told him no and said that it was a friend who had already left. Defendant further stated that he was on the way to Griffs to eat. Officer Sasser smelled an odor of alcohol.
Officer Sasser called his supervisor, Randy Pennington. The two officers conducted field sobriety tests to determine whether Garrison was able to drive. Offi *348 cer Sasser conducted a horizontal gaze nystagmus test on the defendant and determined that he had probable cause to arrest defendant for DWI. Garrison was placed under arrest and taken to the Lincoln Parish Detention Center for a breath test. He refused to take the breath test, and he was booked with DWI Fourth Offense.
Garrison was later charged by bill of information with DWI Third Offense. He initially pled not guilty, then filed motions to quash and suppress. Defendant’s motion to quash asserted defects in the prior DWI convictions. The issues asserted at the hearing were that Officer Sasser had no jurisdiction off campus and even if he did, he did not have a reasonable basis to stop defendant.[2]
|3At the hearing on the motions, Officers Pennington and Sasser testified. The trial court denied the motions. Defendant withdrew his guilty plea and entered a plea of guilty to the charge of DWI Third Offense, reserving his right to appeal the trial court’s ruling on his motion to suppress.

Discussion

Jurisdiction of University Police

Due to the increase of on-campus crime, including incidents of serious crime, university police have evolved from watchmen to professionals. The legislature has provided that “no person shall be commissioned as a college or university police officer unless prior to such commissioning the person has, as a minimum requirement, completed and graduated from the six-weeks program of the Basic Law Enforcement Training Academy of Louisiana State University.” La. R.S. 17:1805 C. Without the ability to patrol, stop and frisk, and arrest, university officers cannot do what is demanded of them, which is to enhance security throughout the area where students spend their time.
Generally campus police have authority on campus. This jurisdiction is based on property ownership. Louisiana has extended to university police statewide or off campus authority when on official business, such as, engaging in intelligence gathering, investigating a crime committed on campus, when transporting prisoners, when transporting money, securities, or valuables for the institution, while providing security for visiting [ ¿dignitaries and if requested by the parish or city chief law enforcement officer.[3] La. R.S. 17:1805 D.
The legislature has specifically provided that college and university police officers have “the power of arrest when discharging their duties on their respective campuses and on all streets, roads, and rights-of-way to the extent they are within or contiguous to the perimeter of such campuses.” La. R.S. 17:1805 A(3).
Thornton Street runs through the Louisiana Tech campus. Approximately one block after Thornton Street leaves the boundary of the Tech campus, it intersects with Carey Avenue. Louisiana Tech has a parking lot on Carey Avenue. West California Avenue is less than a half block from the intersection of Carey Avenue and Thornton Street. West California Avenue is also U.S. Highway 80.
In this case, the campus officer drove one and a half blocks off campus on Thornton Street, turned around, and was heading back to the campus when he heard a disturbance originating from the Louisiana Tech parking lot on Carey Avenue. We agree with the trial court that this short *349 distance between the campus boundary and an off-site campus parking lot qualifies as being contiguous to the perimeter of the parking lot as well as the main campus. To suggest that a campus officer cannot drive one block | Roff campus to another site owned by the university and used for parking would be contrary to the objective of enhancing security.[4]

The Stop

The law permits police to seek the voluntary cooperation of the public in the investigation of a possible crime. An officer does not violate the prohibition against unlawful seizures by requesting that an individual give information or cooperation in the investigation or prevention of a crime. Such voluntary inquiries are vital in police investigatory work. In Illinois v. Lidster, 540 U.S. 419, 426, 124 S.Ct. 885, 890, 157 L.Ed.2d 843 (2004), the U.S. Supreme Court stated, “[I]t would seem anomalous were the law (1) ordinarily to allow police freely to seek the voluntary cooperation of pedestrians but (2) ordinarily to forbid police to seek similar voluntary cooperation from motorists.”
In this case the officer’s initial action in getting defendant to stop was the only means available to get defendant’s attention long enough to request information. The officer had actually passed Carey Avenue going back to the campus when he heard a disturbance originating from the Tech parking lot and turned around to investigate and saw defendant. He stopped defendant to ask for information. It was not until the officer noted sufficient indicia of inebriation that he had a reasonable suspicion and probable cause | fito believe that defendant was a danger as he was driving under the influence.
This was not a checkpoint set up to look for evidence of drunk driving or any other crime, as in Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). In discussing Edmond, the Supreme Court in Lidster stated:
Neither do we believe, Edmond aside, that the Fourth Amendment would have us apply an Edmond-type rule of automatic unconstitutionality to brief, information-seeking highway stops of the kind now before us. For one thing, the fact that such stops normally lack individualized suspicion cannot by itself determine the constitutional outcome. As in Edmond, the stop here at issue involves a motorist. The Fourth Amendment does not treat a motorist’s car as his castle. See, e.g., New York v. Class, 475 U.S. 106, 112-113, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). And special law enforcement concerns will sometimes justify highway stops without individualized suspicion. See Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (sobriety checkpoint); Martinez-Fuerte, supra (Border Patrol checkpoint). Moreover, unlike Edmond, the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion has little role to play. Like certain other forms of police activity, say, crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual.
For another thing, information-seeking highway stops are less likely to provoke *350 anxiety or to prove intrusive. The stops are likely brief. The police are not likely to ask questions designed to elicit self-incriminating information. And citizens will often react positively when police simply ask for their help as “responsible citizen[s]” to “give whatever information they may have to aid in law enforcement.” Miranda v. Arizona, 384 U.S. 436, 477-478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Lidster, 540 U.S. at 424, 124 S.Ct. at 889.
]7In considering the reasonableness of the stop at issue in this case, we note again that this was not a checkpoint stop. Rather, at 11:00 o’clock at night, the officer heard a disturbance of public concern. The officer observed one vehicle leaving the area and stopped that vehicle to ask the occupant and driver what he may have seen or heard. The officer had no intent to arrest or even ticket defendant. There was a public concern, and the intrusion was minimal. There was no discriminatory action.

Conclusion

The conviction and sentence are affirmed.
STEWART, J., dissents with written reasons.

. Defendant pled guilty without an admission of guilt as provided in North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and was sentenced to three years at hard labor, with all but 30 days suspended, and was placed on three years supervised probation.

. The motion to suppress is not in the record, but the record shows defendant filed a memorandum in support of the motion to suppress.

. The statute also requires authorization from the chief administrative officer of the university.

. In brief, defendant states that Officer Sasser “was not legally commissioned under the statute, inasmuch as he never put up the bond required ...” Officer Sasser testified that he was a commissioned university officer and that he did not know if Tech put up the required bond. Thus, we find the record supports that Officer Sasser is a commissioned law officer.