IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-57

No. 28A21

Filed 6 May 2022

STATE OF NORTH CAROLINA

v.

DESHANDRA VACHELLE COBB

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 275 N.C. App. 740, 853 S.E.2d 803 (2020), vacating an order entered on 3 April 2019 by Judge Claire V. Hill in Superior Court, Harnett County, and remanding the case for further proceedings. Heard in the Supreme Court on 15 February 2022.

*Joshua H. Stein, Attorney General, by Kindelle McCullen, Assistant Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Wyatt Orsbon, Assistant Appellate Defender, for defendant-appellee.*

BERGER, Justice.

¶ 1    Defendant pleaded guilty to impaired driving after the trial court denied her motion to suppress evidence obtained at a Harnett County checking station. The Court of Appeals vacated the trial court's order denying defendant's motion to suppress, and the State appeals based upon a dissent. For the reasons stated below, we reverse the decision of the Court of Appeals and reinstate the order of the trial

court.

## I.    Factual Background

At approximately 12:15 a.m. on August 28, 2016, defendant was driving her vehicle in Harnett County when she approached a checking station operated by the North Carolina State Highway Patrol.  When defendant rolled down her window, Trooper BJ Holder detected a strong odor of alcohol emanating from the vehicle.  Trooper Holder asked defendant if she had been drinking, and defendant responded that she had two shots of Grey Goose vodka at a bar.  Trooper Holder asked defendant to step out of the vehicle.

Upon exiting, defendant was unsteady on her feet and Trooper Holder requested that defendant perform standard field sobriety tests, including a horizontal gaze nystagmus (HGN) test.  Six of six clues of impairment were present when the HGN test was administered.  A breath sample provided by defendant at the Harnett County Detention Center registered a blood alcohol level of 0.11 on the Intox EC/IR II device.  Defendant was charged with one count of driving while impaired and one count of reckless driving.[1]

A Checking Station Authorization form (HP-14 form) was completed for the checking station by Sergeant John Bobbitt of the NCSHP.  The form indicated that the primary purpose of the checking station was "Chapter 20 enforcement" which

---

[1] The State later dismissed the charge of reckless driving.

included "at a minimum, checking each driver stopped for a valid driver's license and evidence of impairment." Further, pursuant to the information set forth on the HP-14 form, the checking station was to operate between the hours of 12:15 a.m. and 2:00 a.m. on August 28, 2016, and Sergeant Bobbitt was noted as the supervising member in charge.

¶ 5 On February 6, 2019, defendant filed a motion to suppress evidence of her blood alcohol level contending that the checking station was unconstitutional and violated N.C.G.S. § 20-16.3A.[2] Thus, defendant argued, "any evidence obtained [wa]s in violation of [d]efendant's rights and must be suppressed and any charges arising therefrom must be dismissed."

¶ 6 From the testimony presented at the hearing on the motion to suppress, the trial court found as fact that Sergeant Bobbitt had been employed with the NCSHP for approximately twenty-five years. In addition, the trial court found that Sergeant Bobbitt completed and signed the HP-14 form, and the form "complied with the statutory and other regulatory requirements regarding checking stations." The findings of fact detailed that the checking station was located "a short distance to [NC] Highway 87 and three county lines making it a major thoroughfare into and out

---

[2] Defendant did not argue on appeal that the checking station violated N.C.G.S. § 20-16.3A. Defendant has, therefore, abandoned the argument. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

of the county." "The public concern addressed[,]" the trial court went on to find, "was the public safety in confirming motorists were in compliance and not violating any Chapter 20 Motor Vehicle Violation."

¶ 7        Additionally, the trial court included findings of fact related to the execution of the checking station by the NCSHP. Specifically, the trial court found that "[t]he seizure was short in time for most drivers . . . since most drivers were stopped for less than one minute" if they "had their driver's license and registration." Further, the trial court's findings indicate that "[a]t least two [NCSHP] vehicles with blue lights were on at all times[,]" and "[t]he participating members were wearing their [NCSHP] uniforms with reflective vests and utility flashlights." This allowed for the checking station to be "observed from any direction of approach from one-tenth up to one-half a mile [away,]" giving drivers "adequate time to observe the checking station and come to a stop." The trial court also found that although "[t]raffic did back up some" because "every vehicle that approached this checking station was checked[,]" the negative effect on the flow of traffic was "not extreme."

¶ 8        Based on these findings of fact, the trial court then concluded as a matter of law that:

> 1.    The plan was reasonable and the checking station did not violate the Defendant's U.S. or N.C. constitutional rights.
>
> 2.    The checking station as it was operated advanced the public concern and was reasonable.

3. Enforcement of the motor vehicle laws is a legitimate public purpose and promotes public safety.

4. The short amount of time that the checking station potentially interfered with an individual's liberty was not significant.

Accordingly, the trial court denied defendant's motion to suppress.

Following the denial of the motion to suppress, defendant pleaded guilty to the charge of driving while impaired, expressly reserving her right to appeal the denial of the motion to suppress. Defendant's sentence of sixty days imprisonment was suspended, and she was placed on unsupervised probation. Defendant timely appealed.

In a split decision, the Court of Appeals vacated the trial court's order denying defendant's motion to suppress and remanded the case for further proceedings. *State v. Cobb*, 275 N.C. App. 740, 752, 853 S.E.2d 803, 811 (2020). The majority reasoned that because the trial court "did not adequately weigh the three *Brown* factors" required in such an analysis, the trial court "could not assess whether the public interest in this [checking station] outweighed its infringement on [d]efendant's Fourth Amendment privacy interests." *Id.* at 749, 853 S.E.2d at 809. The Court of Appeals determined, and defendant now argues, that the trial court erred in concluding that the checking station was reasonable without adequately engaging in the analysis required by the United States Supreme Court in *Brown v. Texas*, 443

U.S. 47, 50, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357, 361 (1979).

¶ 11        Based on a dissenting opinion, the State timely appealed to this Court, arguing that the majority below erred in concluding that the trial court's order denying defendant's motion to suppress was insufficient to evaluate the constitutionality of the checking station.

## II.    Standard of Review

¶ 12        "[A] trial court's ruling on a motion to suppress is afforded great deference upon appellate review as it has the duty to hear testimony and weigh the evidence." *State v. McClendon*, 130 N.C. App. 368, 377, 502 S.E.2d 902, 908 (1998), *aff'd*, 350 N.C. 630, 517 S.E.2d 128 (1999); *see also State v. Smith*, 278 N.C. 36, 41, 178 S.E.2d 597, 601 (1971). An appellate court's review of a trial court's denial of a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Findings of fact not challenged on appeal are "deemed to be supported by competent evidence and are binding on appeal." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011). Conclusions of law, however, are reviewed de novo and are subject to full review by this Court. *Id.*

¶ 13        Defendant did not challenge any of the trial court's findings of fact as

unsupported by the evidence in the record. Thus, the trial court's findings of fact are binding on appeal.

### III. Analysis

¶ 14 The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Because law enforcement officers effectuate a seizure when they stop a vehicle at a checking station, such stops must conform to Fourth Amendment requirements. *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S. Ct. 447, 453, 148 L. Ed. 2d 333, 342 (2000); *see also United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S. Ct. 3074, 3082, 49 L. Ed. 2d 1116, 1127 (1976) ("[C]heck[ing station] stops are 'seizures' within the meaning of the Fourth Amendment."). The ultimate question in challenges to the validity of a checking station is "whether such seizures are 'reasonable' under the Fourth Amendment." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S. Ct. 2481, 2485, 110 L. Ed. 2d 412, 420 (1990).

¶ 15 As an initial matter, the Supreme Court has instructed that reviewing courts must consider the primary programmatic purpose of a challenged checking station. *Edmond*, 531 U.S. at 40–42, 121 S. Ct. at 453–54, 148 L. Ed. 2d at 342–44. Checking stations established primarily to "uncover evidence of ordinary criminal wrongdoing" run afoul of the Fourth Amendment. *Edmond*, 531 U.S. at 42, 121 S. Ct. at 454, 148 L. Ed. 2d at 343. However, checking stations "designed primarily to serve purposes

closely related to . . . the necessity of ensuring roadway safety" have been held to serve a legitimate primary purpose. *Id.* at 41, 121 S. Ct. at 454, 148 L. Ed. 2d at 333; *see also Sitz*, 496 U.S. at 451, 110 S. Ct. at 2485, 110 L. Ed. 2d 412. In addition, the Supreme Court has upheld checking stations designed to address problems related to policing the border and to assist law enforcement officers in obtaining information to apprehend "other individuals" involved in criminal activity. *See Martinez-Fuerte*, 428 U.S. at 545, 96 S. Ct. at 3077, 49 L. Ed. 2d at 1116; *Illinois v. Lidster*, 540 U.S. 419, 427, 124 S. Ct. 885, 891, 157 L. Ed. 2d 843, 852 (2004).

¶ 16        Here, the primary programmatic purpose of the checking station was uncontested. At the hearing on the motion to suppress, defense counsel acknowledged the primary purpose of the checking station was "to check licenses. We don't disagree . . . they got to the primary purpose[.]" Defendant's concession is reflected in the trial court's unchallenged finding that "[t]here was no argument by the defendant that the purpose of the checking station was . . . not a permitted primary [programmatic] purpose." The trial court's finding is therefore binding on appeal, and we must next determine the reasonableness of the checking station under the Fourth Amendment. *Edmond*, 531 U.S. at 47, 121 S. Ct. at 457, 148 L. Ed. 2d at 347.

¶ 17        This Court has held that "check[ing stations] are constitutional if vehicles are stopped according to a neutral, articulable standard (e.g., every vehicle) and if the

government interest in conducting the check[ing station] outweighs the degree of the intrusion." *State v. Foreman*, 351 N.C. 627, 631, 527 S.E.2d 921, 924 (2000). "The reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brown*, 443 U.S. at 50, 99 S. Ct. at 2640, 61 L. Ed. 2d at 361 (cleaned up). "[W]e must judge [the] reasonableness [of a checking station], hence, its constitutionality, on the basis of individual circumstances." *State v. Mitchell*, 358 N.C. 63, 66, 592 S.E.2d 543, 545 (2004) (first and second alterations in original) (quoting *Lidster*, 540 U.S. at 426, 124 S. Ct. at 890, 157 L. Ed. 2d at 852 (2004)).

¶ 18    In determining whether a seizure that results from a checking station survives constitutional scrutiny, we "weigh[ ] . . . the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown*, 443 U.S. at 50–51, 99 S. Ct. at 2640, 61 L. Ed. 2d at 362. Upon a balancing of these factors, a checking station is deemed reasonable, and therefore constitutional, if the factors weigh in favor of the public interest. *Lidster*, 540 U.S. at 427, 124 S. Ct. at 890, 157 L. Ed. 2d at 852.

¶ 19    Our nation's highest court has held that driver's license checking stations typically satisfy the first *Brown* prong because "the public concerns served by the seizure" outweigh the Fourth Amendment interest of individuals. *Id.* (quoting

*Brown*, 443 U.S. at 50–51, 99 S. Ct. at 2640, 61 L. Ed. 2d at 362); *see also State v. Rose*, 170 N.C. App. 284, 294, 612 S.E.2d 336, 342, *disc. review denied*, 359 N.C. 641, 617 S.E.2d 656 (2005) (holding that license and registration checking stations advance an "important purpose). The public interest in ensuring compliance with motor vehicle laws is a well-established and important public concern. *See Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342. "States have a vital interest in ensuring that only those qualified to [drive] are permitted to operate motor vehicles . . . ." *Delaware v. Prouse*, 440 U.S. 648, 658, 99 S. Ct. 1391, 1398, 59 L. Ed. 2d 660, 670 (1979). Moreover, the Supreme Court has recognized that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. . . . For decades, this Court has repeatedly lamented the tragedy [of deaths resulting from impaired drivers]." *Sitz*, 496 U.S. at 451, 110 S. Ct. at 2485–86, 110 L. Ed. 2d at 420–21 (cleaned up).

¶ 20 Consistent with the requirement of *Brown*, the trial court found that "[t]he public concern addressed with this particular checking station was the public safety in confirming motorists were in compliance and not violating any Chapter 20" provision and that this purpose was clearly set forth in establishing the checking station. The trial court determined the purpose of ensuring each driver had a valid driver's license and was not driving while impaired "operated [to] advance[ ] the public concern and was reasonable."

¶ 21    Under the second prong of the *Brown* analysis, the trial court examined "the degree to which the seizure advance[d] the public interest." *Brown*, 443 U.S. at 51, 99 S. Ct. at 2640, 61 L. Ed. 2d at 362. A consideration at this step is whether "[t]he police appropriately tailored their check[ing station] stops" to fit the primary purpose. *Lidster*, 540 U.S. at 427, 124 S. Ct. at 891, 157 L. Ed. 2d at 852. Alongside other factors, the use of time and location limitations in establishing and operating the checking station provides evidence that the vehicle stop was appropriately tailored. *See id.* (finding that the police's selection of a specific time and location was sufficiently tailored as "[t]he stops took place about one week after [a] hit-and-run accident, on the same highway near the location of the accident, and at about the same time of night").

¶ 22    Based on the evidence presented, the trial court found that the checking station was planned and operated pursuant to a HP-14 form completed by Sergeant Bobbitt. The checking station was established a short distance from NC Highway 87, on a heavily travelled thoroughfare in an area where three county lines converge. Additionally, the trial court found the checking station was in effect during a previously agreed upon timeframe and date, between 12:15 a.m. and 2:00 a.m. on August 28, 2016, and extended no longer than that time. These findings demonstrate that the checking station was conducted in a location where there was increased motor vehicle traffic and during a timeframe conducive to apprehending impaired

drivers.

¶ 23      With respect to the final factor of the *Brown* analysis, the severity of the interference with individual liberty, the focus shifts to how the checking station was conducted. *Brown*, 443 U.S. at 51, 99 S. Ct. at 2640, 61 L. Ed. 2d at 362. Specifically, the third factor requires a checking station to "be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* This ensures that officers are not able to exercise "unfettered discretion" that results in the invasion of motorists' liberties. *Id.*

¶ 24      The Supreme Court has designated a number of nonexclusive factors as relevant considerations, including the checking station's interference with regular traffic, whether notice of the checking station was given to approaching drivers, and whether there was a supervising official overseeing the checking station. *See Martinez-Fuerte*, 428 U.S. at 559, 96 S. Ct. at 3083–84, 49 L. Ed. 2d at 1129.

¶ 25      Here, as discussed above, the trial court's unchallenged findings of fact show that the checking station was conducted pursuant to the plan established and documented by Sergeant Bobbitt. The plan included explicit limitations regarding the location and timeframe of the checking station. Further, the trial court found that all vehicles were stopped pursuant to the established plan. While the trial court found that "[t]raffic did back up some" because all vehicles were stopped, the backup was "not extreme."

Moreover, the trial court found that drivers were put on notice of the checking station as "[a]t least two [NCSHP] vehicles with blue lights were on at all times" during the checking station. Additionally, the trial court found that "participating members were wearing their [NCSHP] uniforms with reflective vests and utility flashlights." Finally, based on evidence showing that the checking station was approved and executed by Sergeant Bobbitt, the trial court made various findings indicating that the checking station was operated under a supervising officer from start to finish.

In focusing on the specific conduct of the officers during the vehicle stops, the trial court found that officer conduct was sufficiently limited, stating:

> 19. The seizure was short in time for most drivers . . . since most drivers were stopped for less than one minute.
>
> . . . .
>
> 28. If drivers had their driver's license and registration the stop lasted one minute or less.

These findings indicate that the checking station was not operated with "unfettered discretion" but rather with specific restraints on time, location, and officer conduct. It follows that the trial court properly concluded that the "short amount of time that the checking station potentially interfered with an individual's liberty was not significant." Thus, the checking station was appropriately tailored to address the stated purpose.

In balancing the factors set forth in *Brown*, the trial court concluded that the public interest served by the checking station outweighed the intrusion on defendant's liberty interests. The unchallenged findings of fact support this conclusion, and the checking station was reasonable under the Fourth Amendment.

## IV. Conclusion

Based on our review of the trial court's unchallenged findings of fact, the public interest in conducting the checking station outweighed any intrusion on defendant's liberty interests, and the checking station was, therefore, reasonable under the Fourth Amendment. Accordingly, we reverse the decision of the Court of Appeals and reinstate the order of the trial court denying defendant's motion to suppress.

REVERSED.