State of Nebraska, appellee, v.
Adam T. Woldt, appellant.
___ N.W.2d ___

Filed July 21, 2015.    No. A-14-573.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.
2. **Trial: Investigative Stops: Warrantless Searches: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.
3. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.
4. **____: ____.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.
5. **Constitutional Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Search and Seizure.** Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment.
6. **Constitutional Law: Investigative Stops: Warrantless Searches: Probable Cause: Police Officers and Sheriffs.** Police can constitutionally stop and briefly detain a person for investigative purposes if

the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the Fourth Amendment.

7. **Constitutional Law: Search and Seizure: Motor Vehicles.** A motorist has a reasonable expectation of privacy which is not subject to arbitrary invasions solely at the unfettered discretion of police officers in the field.

8. **Constitutional Law: Highways: Motor Vehicles: Investigative Stops: Search and Seizure.** A vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment.

9. **Highways: Investigative Stops.** A highway checkpoint must be both authorized by an approved plan and conducted in a manner that complies with the plan and the policy established by the authority at the policymaking level.

10. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.

11. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

Appeal from the District Court for Cuming County, JAMES G. KUBE, Judge, on appeal thereto from the County Court for Cuming County, MICHAEL L. LONG, Judge. Judgment of District Court reversed, and cause remanded with directions.

Thomas B. Donner for appellant.

Jon Bruning, Attorney General, and Austin N. Relph for appellee.

MOORE, Chief Judge, and IRWIN and RIEDMANN, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Adam T. Woldt appeals from the order of the district court for Cuming County which affirmed his conviction in the county court for driving under the influence (DUI). The sole issue presented to us in this appeal is whether the stop of Woldt's vehicle for the purpose of gathering information about a third party's possible criminal activity violated

Woldt's constitutional right to be free from an unreasonable search and seizure. We conclude that the stop was unlawful and that Woldt's motion to suppress should have been sustained.

## BACKGROUND

On September 26, 2013, the State filed a complaint in the county court, charging Woldt with first-offense DUI in violation of Neb. Rev. Stat. § 60-6,196 (Reissue 2010), a Class W misdemeanor.

Woldt filed a motion to suppress, which was heard by the county court on November 5, 2013. The State presented testimony from police officers involved in the investigations on the evening in question. Woldt testified and also presented testimony from the other individual who was investigated on the evening in question.

The evidence at the hearing showed generally that on September 13, 2013, Officer Randy Davie of the Wisner Police Department received a call from dispatch about a report that someone driving a white Chevrolet pickup was knocking over traffic cones on the highway that is the main street of Wisner, Nebraska. At the scene, Davie observed 38 cones knocked down along both sides of the highway.

While picking up the cones, Davie heard squealing tires north of his location. After picking up the cones, he drove north on a side street. Davie was driving without lights because he "was going to see who was squealing their tires." He then observed a white Chevrolet pickup followed within a car length or less by a dark-colored pickup proceeding toward him south on the side street.

When the white pickup neared Davie's location, Davie turned on his patrol car's headlights and extended his arm straight out of the patrol car's window indicating that the white pickup should stop. Davie did not turn on his patrol car's overhead lights or sirens during the stop of the white pickup. The driver of the white pickup, whom Davie recognized as Jacob Biggerstaff, pulled over and stopped south of

Davie's patrol car by about four to five car lengths. Davie stopped the white pickup because he thought that it might have been involved in knocking over the traffic cones on the highway. Davie exited his patrol car, left its door open, and walked over to contact Biggerstaff. Upon contacting Biggerstaff, Davie smelled the odor of alcohol, and at that point, he began a DUI investigation of Biggerstaff. Davie did not ask Biggerstaff about the traffic cone incident but asked him to step out of the pickup. When Biggerstaff complied, Davie took him to the patrol car. Davie remained outside of the patrol car, and Biggerstaff seated himself in the passenger side of the patrol car without Davie's assistance.

While this was happening, the driver of the dark-colored pickup, whom Davie recognized as Woldt and whom Davie knew to be a city employee, had parked his pickup across from Davie's patrol car on the west side of the side street near an intersection. Davie testified that the front of his patrol car was about even with the intersection and that Woldt's pickup was parked with the rear 3 to 4 feet extending into the intersection. Woldt testified that he was in the process of making the turn south onto the side street when he saw Davie motion to stop Biggerstaff. Woldt pulled over and parked behind another parked car. According to Woldt, he was unable to proceed south down the street because his line of travel was blocked by Davie's open car door and he could not continue closer to the curb because of the parked car in front of him. Woldt remained in his pickup with the window rolled down. As Davie and Biggerstaff were approaching the patrol car, Woldt began to reverse his pickup.

Davie then held up his hand and gestured for Woldt to approach. Woldt testified that Davie said something to him at that point, but he could not remember exactly what was said. Davie also could not remember whether he said anything to Woldt. Davie testified that it was his intent to speak with Woldt about whether he had seen Biggerstaff do anything and to ask why he was following Biggerstaff. Davie did not observe anything about the operation of Woldt's pickup that

led him to believe Woldt had violated any rules of the road or any other state laws or city ordinances. Davie testified that he was concerned with the white pickup, and if Woldt had not stopped initially, he would not have stopped him because he "had no reason to stop him." During redirect examination by the State, Davie agreed that he probably could have cited Woldt for following Biggerstaff too closely.

Upon approaching Woldt's pickup, Davie smelled the odor of alcohol and began a second DUI investigation. He asked Woldt whether he had been drinking, and at that point, Woldt "just put his head down." Davie asked Woldt if he was drunk, and Woldt responded by shutting off his pickup and handing the keys to Davie. Davie contacted another officer for assistance. Woldt was then given a field sobriety test and preliminary breath test and was arrested for DUI.

On December 3, 2013, the county court entered an order overruling Woldt's motion to suppress. In analyzing the stop of Woldt, the court utilized the three-part balancing test outlined in *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), which balances the gravity of the public concern served by the seizure and the degree the seizure advances the public interest against the severity of the interference with the seized person's individual liberty.

The county court found Davie's actions were reasonable. The court reasoned that even though the possible offenses Davie was investigating were most likely misdemeanors, the matter did involve operation of a motor vehicle on the four-lane public highway that passes through Wisner. The court concluded that the acts committed in Wisner during the night of September 13, 2013, posed a significant threat to the safety of citizens driving the public roads in and through Wisner. The court found it was also reasonable for Davie to conclude that the driver of the dark-colored pickup that was following Biggerstaff would have been an eyewitness to Biggerstaff's driving. The court stated, "This eyewitness evidence of . . . Biggerstaff's driving would be essential to proving the element of whether . . . Biggerstaff was 'under the influence of

alcohol' at a jury trial on this charge." The court found that the degree of interference with Woldt's liberty in this case was outweighed by the other two elements of the balancing test outlined in *Brown v. Texas, supra*. The court observed that Woldt had voluntarily stopped and remained stopped on the street during the entire time Davie had contact with Biggerstaff and that Woldt's pickup was stopped in the street with the back part of it partially in the intersection. The court stated, "It appears that . . . Davie intended to speak to . . . Woldt momentarily before continuing his investigation of . . . Biggerstaff." The court concluded that Davie's interference with Woldt's liberty was slight and reiterated its finding that the stop of Woldt was reasonable.

On February 4, 2014, a bench trial on stipulated facts was held before the county court. At trial, Woldt renewed the objections raised in his motion to suppress and made at the suppression hearing. The court overruled Woldt's objections. The court received into evidence the transcription of the suppression hearing, including the exhibits received at the hearing, as well as the parties' stipulation. The stipulation included the fact that if called to testify, witnesses would testify that on September 13, 2013, upon Woldt's completion of field sobriety tests, a law enforcement officer had reasonable grounds to believe Woldt was driving or was in actual physical control of a motor vehicle while under the influence of alcohol. The stipulation also provided that a chemical test of Woldt's breath showed that he had a concentration of .08 of 1 gram or more by weight of alcohol per 210 liters of his breath, with the specific result being .148. The court found Woldt guilty of first-offense DUI and sentenced him to probation for a period of 6 months, ordered him to pay a fine of $500 and all costs of prosecution, and revoked his operator's license for 60 days.

Woldt appealed his conviction and sentence to the district court, and in his statement of errors, he asserted that the county court erred in overruling his motion to suppress,

admitting evidence obtained after the stop of his pickup, and finding sufficient evidence to convict him.

Following a hearing, the district court entered an order on June 17, 2014, affirming Woldt's conviction and sentence. On appeal, Woldt did not dispute the appropriateness of the county court's use of the balancing test from *Brown v. Texas*, 433 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), even though this case is not one involving a checkpoint stop, but he argued that the county court did not place the appropriate weight on the factors of the test.

With respect to the gravity of the public concern served, the district court noted that in addition to the knocked-over traffic cones, Davie was investigating the possibility that Biggerstaff had been driving while under the influence. The court considered this to be significant and did not consider this crime to be less severe than those addressed in cases cited by Woldt.

Next, the district court addressed Woldt's argument that without a sufficient nexus between the alleged criminal act and the need to stop a potential witness, the public interest could not be served sufficiently to allow for his seizure. Woldt agreed that an investigation into Biggerstaff's commission of a crime had begun, but he argued that Davie had obtained insufficient information in order to stop Woldt and ask what he knew. The court noted Davie's observation of Woldt's following Biggerstaff closely as they approached Davie's patrol car and of Woldt's sitting in his parked pickup with its lights on and the window down as if he might want to say something to Davie. The court found it reasonable to believe that Woldt had some information which might have assisted in the investigation of Biggerstaff and considered this a sufficient nexus to support Davie's actions on the night in question.

Finally, the district court considered Woldt's argument that the interference with his liberty interest was severe and outweighed the other two factors. The court noted that although there was conflicting evidence about whether Woldt could

have driven past Davie and Biggerstaff, he did not do so. The court found no evidence of any command being made by Davie as neither Davie nor Woldt could remember what, if anything, was said. The court found that although Davie could not have been absolutely certain Woldt had any information about Biggerstaff, considering the totality of the circumstances, it was reasonable for Davie to perceive either that Woldt wanted to convey some information or that he might possess information helpful to the investigation. The court concluded that the degree of interference with Woldt's liberty interest on the night in question was outweighed by the gravity of the public concern served by the seizure along with the degree to which the seizure advanced the public interest in this case. Accordingly, the district court affirmed the county court's decision with regard to Woldt's motion to suppress in its entirety. Woldt subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Woldt asserts, consolidated and restated, that the district court erred in affirming the county court's (1) overruling of his motion to suppress and (2) finding of sufficient evidence to convict him. However, Woldt does not argue his sufficiency of the evidence assignment of error. Accordingly, we only address his arguments with respect to the motion to suppress. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Turner*, 288 Neb. 249, 847 N.W.2d 69 (2014).

## STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that

an appellate court reviews independently of the trial court's determination. *State v. Piper, supra*. The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Dalland*, 287 Neb. 231, 842 N.W.2d 92 (2014).

## ANALYSIS

[3-6] At issue in this case is whether Davie's suspicionless stop of Woldt to gather information about Biggerstaff's possible criminal activity violated Woldt's Fourth Amendment rights. The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. *State v. Piper, supra*. A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Avey*, 288 Neb. 233, 846 N.W.2d 662 (2014). Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008). Police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the Fourth Amendment. *State v. Allen*, 269 Neb. 69, 690 N.W.2d 582 (2005), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

There is no dispute in this case that a seizure of Woldt occurred when he was stopped by Davie. In determining whether the seizure violated Woldt's Fourth Amendment rights, both the county court and the district court applied the three-part balancing test outlined in *Brown v. Texas*, 443 U.S.

47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), which recognizes that seizures without reasonable suspicion may be reasonable under certain circumstances. In that case, police officers stopped the defendant who was walking in an area with a high rate of drug traffic. The officers did not suspect him of criminal activity but wanted to determine his identity under a state law requiring a lawfully stopped individual to identify himself or herself. The Court found that the defendant had been seized in violation of the Fourth Amendment to the U.S. Constitution and stated:

> The reasonableness of seizures that are less intrusive than a traditional arrest . . . depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." . . . Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. . . .
>
> A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. . . . To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

*Brown v. Texas*, 443 U.S. at 50-51 (citations omitted).

The U.S. Supreme Court also applied the balancing test from *Brown v. Texas, supra*, in *Illinois v. Lidster*, 540 U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004). The *Lidster* Court addressed the reasonableness of a suspicionless checkpoint stop to gather information regarding a fatal hit-and-run accident that occurred 1 week prior at that location. In that

case, police set up a checkpoint 1 week after a hit-and-run accident at the same location where the accident occurred. Officers briefly stopped each vehicle, asked whether the occupants had seen anything the week before, and gave each driver a flyer with relevant information. When the defendant approached, he swerved and almost hit an officer, and upon contact, the officer smelled alcohol on his breath. Following a sobriety test, the defendant was arrested and convicted of driving while under the influence of alcohol.

In *Lidster*, the U.S. Supreme Court distinguished *Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000), a case relied on by the Illinois Supreme Court in its decision below. The primary purpose of the checkpoint at issue in *Edmond* was to determine whether the vehicle's occupants were committing a crime, and the Court found that type of checkpoint violated the Fourth Amendment. In distinguishing *Edmond*, the *Lidster* Court stated:

[I]nformation-seeking highway stops are less likely to provoke anxiety or to prove intrusive [than the type of stop in *Edmond*]. The stops are likely brief. The police are not likely to ask questions designed to elicit self-incriminating information. And citizens will often react positively when police simply ask for their help . . . .

540 U.S. at 425. The *Lidster* Court stated further:

[T]he law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." . . . That, in part, is because voluntary requests play a vital role in police investigatory work. . . .

The importance of soliciting the public's assistance is offset to some degree by the need to stop a motorist to obtain that help—a need less likely present where a pedestrian, not a motorist, is involved. The difference

is significant in light of our determinations that such an involuntary stop amounts to a "seizure" in Fourth Amendment terms. . . . That difference, however, is not important enough to justify an *Edmond*-type rule here. After all, as we have said, the motorist stop will likely be brief. Any accompanying traffic delay should prove no more onerous than many that typically accompany normal traffic congestion. And the resulting voluntary questioning of a motorist is as likely to prove important for police investigation as is the questioning of a pedestrian. Given these considerations, it would seem anomalous were the law (1) ordinarily to allow police freely to seek the voluntary cooperation of pedestrians but (2) ordinarily to forbid police to seek similar voluntary cooperation from motorists.

540 U.S. at 425-26.

The *Lidster* Court then applied the balancing test from *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), finding the relevant public concern at issue, investigation of a fatal traffic accident, to be grave, noting that the police objective was to seek help in finding the perpetrator of a specific and known crime. The Court also found that the checkpoint stops significantly advanced the grave public concern as they were appropriately tailored to meet law enforcement's criminal investigatory needs. Specifically, the checkpoint was set up 1 week later near the accident location, and at about the same time of night, and it sought information from drivers who might have been in the area when the crime occurred. Finally, the Court found that the interference with drivers' liberty interest was minimal. The police systematically and briefly stopped all vehicles at the checkpoint, asked if they had information, and handed out flyers. Accordingly, the Court concluded that the checkpoint was constitutional.

[7] The Nebraska Supreme Court has also addressed the constitutionality of checkpoint stops. In *State v. Crom*, 222 Neb. 273, 383 N.W.2d 461 (1986), Nebraska adopted the

unfettered discretion standard of *Brown v. Texas, supra*. In the *Crom* case, several low-ranking police officers decided to set up transitory checkpoints and stop every fourth vehicle to check the operator's license and vehicle registration, although the real purpose of the stops was to detect alcohol use. The checkpoints were not subject to any standards, guidelines, or procedures established by the police department, and the officers were free to move the checkpoints from place to place at various times as they saw fit. The court cited *Brown* and found that a motorist has a reasonable expectation of privacy which is not subject to arbitrary invasions solely at the unfettered discretion of police officers in the field. *State v. Crom, supra*. The court found the checkpoints at issue unconstitutional because there was no plan made at the policymaking level of the police department or elsewhere, leaving the officers free to determine everything about the checkpoints and subjecting stopped motorists to arbitrary invasion at the officers' unfettered discretion.

[8,9] More recently, in *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014), the Nebraska Supreme Court applied *Brown v. Texas, supra*, and cited *Illinois v. Lidster*, 540 U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004), in determining that a stop of the defendant's vehicle at a highway checkpoint conducted by the Nebraska State Patrol was reasonable. When the defendant in *Piper* stopped at the checkpoint, the officer observed that her eyes were bloodshot and watery and that the odor of alcohol emanated from the vehicle. Following the administration of field sobriety tests and a preliminary breath test, the defendant was arrested and subsequently convicted of DUI. On appeal, the court observed that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment. *State v. Piper, supra*. The court, citing *Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000), observed that the public interest served by a checkpoint is assessed according to the primary purpose of the checkpoint, that checkpoints with the primary purpose of uncovering evidence of ordinary wrongdoing

violate the Fourth Amendment. The court also noted that in *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990), the U.S. Supreme Court approved the use of sobriety checkpoints intended to prevent drunk driving. The *Piper* court considered the purpose of the checkpoint, the degree of intrusion, and the discretion of the officers. The court found permissible the purpose of the checkpoint, which was called a vehicle check but was funded by an alcohol enforcement grant and intended to target alcohol violations. The degree of intrusion was minimal as, absent signs of criminal activity, drivers were allowed to proceed after a brief check of their condition, license, vehicle registration, insurance, and certain aspects of the vehicle condition. In considering the officers' discretion, the court noted that a highway checkpoint must be both authorized by an approved plan and conducted in a manner that complies with the plan and the policy established by the authority at the policymaking level. *State v. Piper, supra*. The court analyzed various aspects of the plan approving the checkpoint and of the officers' application of the plan at the checkpoint, and it found that the plan complied with State Patrol policy and did not allow the officers to exercise unfettered discretion in administering the checkpoint. Accordingly, the court affirmed the defendant's conviction and sentence.

The present case, while involving an information gathering stop by law enforcement, did not involve a stop at a checkpoint or roadblock and thus was not subject to the policy protections that were present with respect to the plan for the checkpoint in *Piper*. Accordingly, we turn to cases that have construed and applied *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), and *Illinois v. Lidster, supra*, in other situations where vehicles have been detained by law enforcement for the purpose of gathering information. We have found no such cases in Nebraska. However, we do note the case of *State v. Ryland*, 241 Neb. 74, 486 N.W.2d 210 (1992), wherein the Nebraska Supreme Court found the stop of the defendant violated Fourth Amendment principles. In that case,

the officer located and stopped the defendant to get a statement from him about an accident that he witnessed the week before. When the officer made contact, he noticed signs of alcohol impairment by the defendant, and a DUI investigation, arrest, and conviction followed. The officer acknowledged that there was not an emergency situation. The court found that there was no probable cause or reasonable suspicion of criminal activity involved in the stop of the defendant.

In *State v. Garrison*, 911 So. 2d 346 (La. App. 2005), the Louisiana Court of Appeals held that a university police officer who heard a disturbance in the university's offsite campus parking lot had reasonable grounds to stop the defendant. The officer was on patrol in a marked car and was driving near campus when he heard the sound of tires squealing from the offsite parking lot. The officer observed a driver approaching the area. The officer did not know if a crime had been committed, but he tried to get the driver's attention so he could tell him to be careful. The officer felt the driver did not notice him, so he activated his car's emergency lights and pulled the driver over. The officer asked the driver whether he had squealed his tires, and the driver denied having done so. Because the officer smelled alcohol, he initiated a driving while intoxicated investigation, which led to the arrest and conviction of the defendant. In finding the stop reasonable, the Louisiana court noted that the officer's action in getting the defendant to stop was the only means available in getting his attention long enough to request information. The court also observed that it was not a checkpoint stop, that the officer was investigating a disturbance of public concern, and that the officer stopped a vehicle leaving the area to inquire about what its occupants might have seen or heard. The majority found the intrusion under those circumstances to be minimal. We note that the dissenting opinion in *Garrison* advocated that the investigation of the incident in question was not a disturbance of public concern.

In *Gipson v. State*, 268 S.W.3d 185 (Tex. App. 2008), police were dispatched to investigate a robbery at a retail

store parking lot and were given a description of the suspect. Upon arrival at the scene, an officer entered the parking lot with his vehicle's lights and siren activated in the area where the suspect had been seen fleeing. He observed a car with several occupants preparing to exit the parking lot and positioned his vehicle to stop the car. He felt the car's occupants might be potential suspects or witnesses to the robbery. As the officer exited his vehicle and approached, the driver stated he had witnessed the robbery. The officer then detained and questioned the occupants, one of which was the defendant. As he was doing so, another officer approached and based on the defendant's demeanor initiated a pat-down search of all of the occupants. As a result of the pat-down search of the defendant, credit cards belonging to the robbery victim were recovered, and the defendant was arrested. In applying the reasoning employed in *Illinois v. Lidster*, 540 U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004), the Texas Court of Appeals found that the occupants were lawfully detained. The court reasoned that the officer was investigating a specific and known crime, which was of grave public concern. The court determined that the stop advanced that concern as it was used to seek information from possible witnesses who were in the vicinity at the time of the crime in the area where the suspect was last seen. The court also found the liberty intrusion minimal as the officer had only blocked the car and started walking toward it, when the driver announced he was a witness. Accordingly, further detention of the car was a result of the need to question an actual witness, rather than a potential one.

Another case applying *Illinois v. Lidster, supra*, to a non-checkpoint stop and finding the stop reasonable was *U.S. v. Brewer*, 561 F.3d 676 (7th Cir. 2009). In that case, a police officer was responding at 2:30 a.m. to a dispatch report of a fight at an apartment complex when he heard what sounded like gunshots. As he approached the complex on the only access street, he was passed by a white sport utility vehicle (SUV) going the other way. No other vehicles were on the

road. He alerted other officers to watch for the SUV and proceeded into the apartment complex where bystanders told him the shots had come from a white SUV. The officer passed the information along to dispatch, but by that point, the SUV had already been stopped by a second officer. Upon inquiry by the second officer, the driver admitted he had two guns. Those guns, as well as additional weapons, were found in the SUV.

On appeal, the Seventh Circuit Court of Appeals observed that it was likely that whoever had fired the shots had left the complex. The court further observed that the fact the SUV was driving away from it on the only access street at a time when few vehicles were on the road reinforced the suspicion that even if the driver was not the gunman, he may well have information important for police safety. The court noted the analysis in *Illinois v. Lidster, supra*, and other roadblock cases and observed that this was not a case of random unconstrained conduct by the first officer in deciding that the first vehicle he encountered leaving the complex should be stopped. The court reasoned that, as in *Lidster*, officers had a compelling safety-related reason to question the driver of the first vehicle spotted leaving the complex where shots had been fired, and asking about a gun was the natural first question. The court concluded that the police acted reasonably given the danger-ousness of the crime, the brief time between when the shots were fired and when the SUV was observed leaving the complex, the minimal intrusion on the SUV's occupants, the need for police safety upon entering the complex, and the need to stop potential fleeing suspects.

Woldt urges us to find this case similar to *State v. LaPlante*, 26 A.3d 337 (Me. 2011). In that case, the Maine Supreme Court considered the constitutionality of a state trooper's stop of a vehicle solely to seek information about another vehicle the trooper observed speeding. As the trooper was turning around to pursue, a motorcycle passed him. The trooper was unable to locate the car but did reencounter the motorcycle. The trooper activated his vehicle's lights and stopped the

motorcycle on the chance that the driver had seen what direction the car had gone. There was no independent reason for the trooper to stop the motorcycle. The motorcycle operator was able to identify where the car had turned. While the trooper was speaking to him, he noticed signs that the motorcycle operator might have been drinking and began an investigation that led to the operator's arrest for DUI.

On appeal, the Maine Supreme Court cited *Illinois v. Lidster*, 540 U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004), and relevant state precedent and then applied the balancing test from *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). The court noted other cases in which the investigation of serious crimes had been deemed sufficiently important to outweigh the liberty interests of stopped motorists but concluded that the investigation of a noncriminal speeding offense was not a matter of grave public concern. With respect to the second factor of the balancing test, the court discussed precedent, including *Lidster*, where courts have recognized that motorist stops may significantly advance the investigation of serious crimes when the stops take place in the vicinity of the crime and shortly after its occurrence. The Maine court reasoned that unlike witnesses to a hit-and-run accident or a robbery, motorists were unlikely to take much notice of speeding. The court reasoned further that the likelihood of motorists being able to assist law enforcement with a speeding investigation was not great. The court concluded that even though this particular defendant had provided information, stopping motorists as potential witnesses to speeding violations would not usually significantly advance such investigations. Finally, in examining the liberty interest intrusion, the court noted that cases upholding roadblock stops have found the degree of intrusion lessened when the stops are brief, unlikely to cause anxiety, and planned so as to minimize officer discretion. The court found none of those elements present in the stop of the motorcycle. The court found that the unplanned stop resulted solely from the officer's discretion and was more likely to

cause alarm because the motorcycle operator had no basis to know the reason for or the likely length of the stop. Because there were no formal restrictions on the trooper's discretion and the circumstances of the stop had significant potential to cause alarm and anxiety, the court found a significant interference with the operator's liberty interest. See, also, *State v. Whitney*, 54 A.3d 1284 (Me. 2012) (random stop of motorist to seek information about single vehicle accident ruled invalid where officer was investigating crime of failure to report accident).

We now turn our attention to application of the balancing test from *Brown v. Texas, supra*, to the facts of the present case. The State argues that the stop of Woldt was reasonable because he was a potential witness to several possible crimes in this case, including criminal mischief, reckless driving, and DUI. We disagree and conclude that the matters under investigation under the circumstances of this case were not of grave public concern. Davie was investigating the report of a specific incident that had left traffic cones scattered along both sides of the highway, initially creating a potential hazard for other drivers. He was dispatched to investigate the involvement of a white pickup in the incident and was in the process of picking up the traffic cones when he heard squealing tires in the vicinity. Davie finished picking up the traffic cones, removing the hazard, before locating a white pickup nearby and making contact with its driver. Because Davie observed Woldt closely following Biggerstaff before the stop and because Woldt also stopped and waited with his pickup's window down while Davie made contact with Biggerstaff, it was reasonable for Davie to believe that Woldt was a potential witness to any crimes by Biggerstaff and might have information for Davie that would advance his investigation of those crimes. However, Davie recognized Woldt, knew where he worked, and could have contacted Woldt at a later date if necessary. This was not a situation where Davie was investigating an ongoing threat to public safety committed by an unknown individual. Nor was it a situation where Davie was

faced with an unknown and mobile potential witness, whose help he needed to end an ongoing threat. By the time Davie stopped Woldt, he had already apprehended and detained Biggerstaff. While Davie did not know at that point whether Biggerstaff was the person responsible for knocking down the traffic cones, the degree of any public concern had certainly lessened by the time that he stopped Woldt. Further, while questioning Woldt may have advanced the investigation of any crimes committed by Biggerstaff, the evidence does not show that stopping and questioning Woldt at that time would have advanced the investigation to a greater degree than contacting him the following day at his workplace would have. Finally, although the degree of intrusion on Woldt's liberty interest was not great, under the circumstances, we cannot say that it was outweighed by the degree of public concern and the extent to which questioning Woldt at that time advanced any investigation of Biggerstaff. Accordingly, the district court erred in affirming the county court's overruling of Woldt's motion to suppress on that basis.

[10] We note the State also argues that the stop was reasonable because there were objective bases for the stop, making Davie's subjective motivation for the stop irrelevant. Specifically, the State argues that Davie could have stopped Woldt because he was following Biggerstaff too closely and because he parked his pickup so that it extended into the intersection. See *State v. Sanders*, 289 Neb. 335, 855 N.W.2d 350 (2014) (traffic violation, no matter how minor, creates probable cause for officer to stop driver; if officer has probable cause to stop violator, stop is objectively reasonable and ulterior motivation is irrelevant). Davie testified that had Woldt not stopped initially, he would not have stopped him because he had no reason to do so. Upon redirect examination, Davie agreed that he probably could have cited Woldt for following Biggerstaff too closely. Neither the county court nor the district court addressed the issue of whether the stop of Woldt was reasonable on this basis. Accordingly, we do not address the issue further. An appellate court will not consider

an issue on appeal that was not presented to or passed upon by the trial court. *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013).

[11] Although we have concluded that Woldt's motion to suppress should have been sustained, this determination does not preclude a new trial under the concepts of double jeopardy. The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. See *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011).

## CONCLUSION

The district court erred in affirming the county court's overruling of Woldt's motion to suppress. Accordingly, we remand to the district court with directions to reverse Woldt's conviction and to remand the cause to the county court with directions to sustain the motion to suppress and for further proceedings consistent with this opinion.

Reversed and remanded with directions.